# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 13, 2000

## STATE OF TENNESSEE v. ANTONIO JACKSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-13179-80    James C. Beasley, Jr., Judge**

---

**No. W1999-00712-CCA-R3-CD - Filed March 1, 2001**

---

The defendant appeals his convictions for facilitation of first degree murder and especially aggravated kidnapping. He raises issues regarding the sufficiency of the evidence relative to accomplice testimony, the competency of a witness, the exhibition of the victim's skull to the jury, and the failure to merge the convictions for due process and double jeopardy purposes. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOE G. RILEY and ALAN E. GLENN, JJ., joined.

Jeffery S. Glatstein, Memphis, Tennessee, for the appellant, Antonio Jackson.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; Paula Wulff, Assistant District Attorney General; and Patience Branham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Antonio Jackson, appeals as of right from his jury convictions in the Shelby County Criminal Court for facilitation of premeditated first degree murder and especially aggravated kidnapping of Vernon Green, Class A felonies, for which he received consecutive twenty-five-year sentences. The defendant contends the following:

(1) The evidence is insufficient to sustain the convictions;

(2) the trial court erred in finding that Christopher James was not an accomplice;

(3) the trial court erred in finding that James's testimony corroborated the testimony of Jarvis Shipp;

(4) the trial court erred in not striking James's testimony after he said he did not know what it meant to tell the truth;

(5) the trial court erred in allowing the victim's skull to be exhibited to the jury during the trial;

(6) the trial court erred by failing to merge the defendant's convictions in violation of due process; and

(7) the trial court erred by failing to merge the defendant's convictions in violation of the Double Jeopardy Clause of the Tennessee Constitution.

We affirm the judgments of conviction.

The killing of Vernon Green late April 30 or early May 1, 1997, arose from a conflict between two Memphis gangs, the Gangster Disciples and the Vice Lords. The victim was found shot to death in Bellevue Park, also known as Jessie Turner Park. The evidence against the defendant principally came from two individuals, Christopher James and Jarvis Shipp.

Christopher James, known as Big Chris, testified that he had been a member of the Gangster Disciples for three to four months when the events of April 30, 1997, occurred. He said that a fight erupted between Jarvis Shipp's girlfriend and the girlfriend of a member of the Vice Lords known as Snoop. Then Shipp and Snoop started fighting which led to others fighting. One of the Vice Lords shot a Gangster Disciple known as Popcorn. James indicated that he ran away once the fight started.

James testified that members of the Gangster Disciples from all over Memphis gathered in an apartment in Hurt Village. He said that there could have been thirty people present and that he stayed in the hallway outside the apartment. James testified that Prentiss Phillips, the head of the Hurt Village Disciples, stated that the victim was outside the building watching them for the Vice Lords. Gregory Robinson, the "chief of security" for the Disciples in Memphis, ordered that the victim be brought inside. Once inside, the victim was beaten by Shipp and several others. James said the defendant arrived after the victim was seized and stood against a wall during the victim's beating.

James testified that Robinson ordered that the victim be taken to a car and that the defendant and others took the victim outside, two holding him by his arms. James said that the defendant had a ".12 gauge Mossberg" which looked like a .20 gauge shotgun with a pistol grip. James denied knowing what was going to happen to the victim.

James testified that at the same meeting, he was beaten by six gang members because he had not helped Shipp fight earlier that day. He said that he had not been a member of the Disciples since that day.

Jarvis Shipp, known as J-Roc, testified that he was "chief of security" for the Hurt Village Gangster Disciples when the events in question occurred. He said his main duty was to protect

Prentiss Phillips, the "coordinator" or head of the Disciples in Hurt Village. He said that a fight between the Disciples and Vice Lords earlier in the evening resulted in a gathering of Gangster Disciples at an apartment in Hurt Village. Shipp stated that Gregory Robinson, chief of security for the Disciples in Memphis, saw the victim peeking around the corner of the building when Robinson arrived. Phillips told Robinson that the victim was with the Vice Lords, and Shipp and others were sent to bring the victim inside.

Shipp testified that although the victim wore his hat like the Vice Lords did, he knew the victim was not actually a member. The victim also denied being a member, but Phillips claimed he was and hit him with a gun. The victim denied knowing anything, but after he was beaten, he said that the Vice Lords were "posting up" in another building in the Village. Shipp and others went to verify the victim's story, but they saw no Vice Lords.

Shipp testified that when he returned to the apartment with his report, the victim was sent upstairs while Robinson had Christopher James beaten for not helping in the earlier fight. Afterwards, the head of the Disciples of Memphis, Kevin Foley, also known as Kaos, told Phillips and Robinson that they knew what to do to take care of their own and then left the apartment. Shipp said that after Foley left, Robinson talked to him by telephone and reported to them that Kaos said to take the victim "fishing." Shipp said that he, the defendant, and other members took the victim to a car and then drove to Jessie Turner Park in two separate cars.

Shipp testified that they took the victim to the top of the hill. He said that the defendant retrieved a pump shotgun with a pistol grip from the trunk of a car. The victim was placed on the ground and the members stood around him, with the defendant at his feet. Shipp said the defendant shot the victim in the buttocks and in the right side of the face. The defendant said the victim was not dead, and after obtaining a handgun from one of the others, he shot the victim twice more.

Shipp testified that after everyone returned to the apartment, the defendant said that he hoped everyone would stay silent. Shipp said that after he was arrested and in jail with the defendant, the defendant offered him money to make bail and leave. Shipp said he was in protective isolation in the jail at the time he was testifying.

The autopsy showed that the victim received shotgun wounds to the right side of the head, the upper back, and the left buttock. He also received two gunshot wounds to the right temple. Dr. Thomas Deering, the assistant medical examiner, testified that from the nature of the skull fracture lines, he could conclude that the gunshot wounds to the head came after the shotgun wound. He explained that a fracture line from the gunshot to the temple stopped at the shotgun's fracture line. He said that each of the shots to the head was fatal.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant's first three issues are related and will be considered together. He claims that the evidence is insufficient to convict him because his connection with the offenses was proven only

by accomplice testimony. In this vein, he claims that the trial court erred in refusing to find Christopher James to be an accomplice as a matter of law.

A conviction in Tennessee cannot be had upon the uncorroborated testimony of an accomplice. Sherrill v. State, 204 Tenn. 427, 433, 321 S.W.2d 811, 814 (1959). The corroborating evidence must be entirely independent from the accomplice's testimony and must independently lead to the inference that the defendant is implicated in the commission of the crime. See Hawkins v. State, 4 Tenn. Crim. App. 121, 133, 469 S.W.2d 515, 520 (1971). However, the corroborating evidence need not, itself, be sufficient to convict the defendant. Id.

An accomplice is one who "knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." State v. Green, 915 S.W.2d 827, 830 (Tenn. Crim. App. 1995). This means that the person must do more than have guilty knowledge, be morally delinquent, or participate in other offenses with the principal actor. See Pennington v. State, 478 S.W.2d 892, 898 (Tenn. Crim. App. 1971). Essentially, an accomplice must be a person who could be indicted for the offense in issue.

When it is clear and undisputed that the witness participated in the crime, the trial court must declare the witness to be an accomplice as a matter of law and so advise the jury. See State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). When the evidence is unclear, conflicts, or is subject to different inferences, then the jury is to determine whether the witness is an accomplice. Id.

In the present case, Jarvis Shipp was clearly an accomplice to the kidnapping and murder. The remaining question is the status of Christopher James. The defendant contends that James was a gang member at a gang meeting who was there "to do whatever he was suppose to do" as a member. The defendant notes that James was present for all of the events involving the victim. The state responds that James's presence at the gang meetings did not make him an accomplice. We agree that the evidence does not show James to be an accomplice as a matter of law.

The gang meeting resulted from the fight that occurred earlier that day. James was also present to be punished for failing to help in the fight. James testified that he was in the hallway the entire time that the victim was being held and questioned. He denied any involvement with the victim or knowledge of what was going to happen. We do not believe that James's presence at the meeting implicates him in either the kidnapping or murder in such a way as to be an accomplice as a matter of law. Moreover, we believe that the evidence would justify the jury determining that James was not an accomplice.

As for the sufficiency of the evidence, our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the

-4-

evidence in favor of the state.  See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

In our analysis, we are mindful that the defendant was convicted of facilitation of first degree murder.  This means that the jury found only that he knowingly furnished substantial assistance in the murder while knowing that others intended to murder the victim.  See Tenn. Code Ann. § 39-11-403.

Christopher James testified that Gregory Robinson ordered the victim be taken to a car.  He said the defendant and others took the victim outside by the victim's arms.  He also said that the defendant was carrying a shotgun with a pistol grip.  The victim's body was found with shotgun wounds.  James's testimony corroborated Jarvis Shipp's testimony regarding what occurred at the gang meeting and the victim's removal to a car by the defendant and others.  In the light most favorable to the state, the evidence shows that the defendant participated in the victim's kidnapping.  Likewise, one can rationally conclude beyond a reasonable doubt that the armed defendant provided substantial assistance to the victim's removal by car, knowing it was for the purpose of murdering the victim.  In fact, we believe that James's testimony sufficiently corroborated Shipp's description of the events so as to have supported a first degree murder conviction if the jury had so found.  In any event, the evidence is sufficient.

## II.  COMPETENCY OF A WITNESS

The defendant contends that the trial court should have stricken Christopher James's testimony after he said that he did not know what it meant to tell the truth.  The defendant argues that James was incompetent as a witness because he obviously could not understand the obligation of the oath regarding telling the truth.  The state responds that the record does not support a conclusion that James was incompetent as a witness.  We agree.

The record reflects that James was a rather inarticulate witness who was prone to cryptic responses.  On cross-examination, defense counsel vigorously attacked James's truthfulness and proved several inconsistent statements by James.  At one point, the following exchange occurred:

> Q.    What does it mean - - do you know what it means, sir, to tell the truth when you're up there?
> A.    Yeah
> Q,    What is the truth, sir?
> A.    I don't know you tell me the meaning.
> Q.    I'm going to ask you.  I think I know what it means.
> A.    I don't know the meaning.
> Q.    You don't know what it means.  Do you know what a lie means?
> A.    Nope.  I ain't educated.

The defense counsel then sought to strike James's testimony, but the trial court refused.

-5-

Generally, every person is presumed competent to be a witness. See Tenn. R. Evid. 601. In order to testify, a witness must declare that he or she "will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscious and impress the witness's mind with the duty to do so." Tenn. R. Evid. 603. This court has previously noted that understanding the obligation of an oath does not mean that the witness is required to have "sufficient academic learning to define an oath or articulate its obligations." State v. Fears, 659 S.W.2d 370, 375 (Tenn. Crim. App. 1983). In other words, the crux of Rule 603 is that the witness must be aware of and sensitive to the obligation to tell the truth under oath.

In this case, the record reflects that defense counsel aggressively cross-examined Christopher James and made direct attacks on his credibility. At one point, James told counsel to stop yelling at him. Obviously, some of the exchanges were heated. In this respect, we view the statements upon which the defendant bases his claim of incompetency to be nothing more than an angry exchange that did not set limits on Mr. James's understanding of his obligation to tell the truth under oath. We conclude that the trial court did not abuse its discretion in refusing to strike Mr. James's testimony.

### III. USE OF SKULL

The defendant contends that the trial court erred in allowing the victim's skull to be exhibited to the jury. He argues that its probative value was substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. The state responds that the skull was needed to demonstrate the number of wounds and that the killing was premeditated and intentional.

At trial, the state asserted that the skull was needed to demonstrate the nature of the injuries and the order in which the shots were fired. It stated that the evidence related to the premeditation and intent of the defendant. It claimed that the cleaned and sterile skull was less graphic than the photographs that the state could display for the same purpose. The trial court, referring to trials of co-defendants, noted that it had heard Dr. Deering's testimony before. It stated that it anticipated that he would use the skull for demonstrative purposes in a "very professional and . . . clinical classroom-type teaching style." It found that the skull was relevant to proving intent and premeditation and concluded that the skull would be allowed as a demonstrative tool.

As in the trial court, the defendant now asserts that use of the skull was not relevant to any issues at trial and was inflammatory. He states that photographs of the victim's wounds that were introduced "more than adequately" presented the jury with a description of the injuries and their impact on the victim. He relies upon two cases in which this court reversed second degree murder convictions because of the state's use of photographs of victims that were deemed unnecessary and inflammatory.

In Gladson v. State, 577 S.W.2d 686 (Tenn. Crim. App. 1978), the defendant was claiming self-defense. The state sought to admit two autopsy slide pictures depicting the victim's cranial bone after removal of the scalp and the brain after removal of the cranial bone. It contended that the pictures were necessary because there was a dispute as to the cause of death, noting that questions

were asked regarding the victim being struck on the head earlier that day. The defendant's attorney offered to stipulate that the death resulted from injuries received in his altercation with the deceased, but the state refused to agree. This court determined that the pictures were inflammatory and added nothing to the evidence, noting that other pictures were introduced showing the wounds before the scalp was cut in the autopsy. Id. at 687.

In State v. Collins, 986 S.W.2d 13 (Tenn. Crim. App. 1998), the defendant was convicted of second degree murder of her newly born child who was found dead in a toilet shortly after its birth. The state submitted color photographs of the infant taken at the morgue. The medical examiner testified that the pictures would show the baby's size, but was not needed to aid his testimony. After initially refusing their admission, the trial court reversed its ruling and allowed the photographs to be used relative to whether or not the defendant knew that she had delivered the infant and that it had died. This court stated that neither the viability of the victim, its size, nor that death was due to drowning were in dispute. It stated that the primary issue was whether the killing was knowing, the mental state necessary for second degree murder. It concluded that the photographs were marginally relevant regarding the size of the victim, but such fact had been established by other proof and was not in dispute. Id. at 20-21. The court noted an increasing concern about the liberal admission of inflammatory autopsy photographs. It stated that "where medical testimony adequately describes the degree or extent of injury, gruesome and graphic photographs should not be admitted." Id. at 21.

The state asserts that the skull was used to show how the wounds supported the state's theory that the murder was a premeditated execution-style killing. It notes that the Tennessee Supreme Court has held that a clean and reconstructed skull used to illustrate an expert's testimony is highly relevant in establishing the circumstances surrounding the offense. See State v. Pike, 978 S.W.2d 904, 925 (Tenn. 1998); State v. Cazes, 875 S.W.2d 253, 263 (Tenn. 1994); State v. Morris, 641 S.W.2d 883, 888 (Tenn. 1982). It also notes that Rule 403, Tenn. R. Evid., requires that the probative value must be substantially outweighed by unfair prejudice. It argues that such is not the case before us.

The trial court's admission of evidence under Rule 403, Tenn. R. Evid., will not be disturbed absent an abuse of discretion. See State v. McCary, 922 S.W.2d 511, 515 (Tenn. 1996). This means that if material evidence exists to support the decision, we will affirm the trial court.

The trial court concluded that the use of the skull as a demonstrative aide was appropriate to help prove that the murder was intended and premeditated, elements that distinguish first degree murder from second degree murder. Dr. Deering's use of the skull corroborated Jarvis Shipp's testimony regarding the order of the shots to the victim, which does indicate premeditated murder. However, we see little need for the skull, given the photographs that were admitted and Dr. Deering's clear and cogent testimony. The manner in which the victim was killed was not disputed. That is, the thrust of the defense dealt with whether the defendant was involved with the killing, not with the nature of the crime. In fact, the defendant did not ask Dr. Deering any questions.

On the other hand, the record reflects that Dr. Deering's use of the skull was sedate in his description of the victim's wounds. The skull was not handled by the jurors but remained in the doctor's possession for the relatively short period of time he took to describe the damages to it. Moreover, we note that the defendant was only convicted for facilitation of first degree murder, a circumstance that does not indicate that he was the victim of an inflamed jury. Thus, although the potential for unfair prejudice existed, we do not believe that use of the skull affirmatively appears to have affected the result of the trial. See Tenn. R. Crim. P. 52(a).

## IV.  MERGER OF OFFENSES

The defendant's two remaining issues relate to the trial court's refusal to merge the defendant's two convictions. The defendant contends that due process and the Double Jeopardy Clause of the Tennessee Constitution require that the convictions merge. The state responds that the law does not support the defendant's claims. We agree with the state.

In State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), our supreme court held that separate convictions for kidnapping and robbery violated due process when the evidence reflected that the kidnapping was essentially incidental to the commission of the robbery. It noted that every robbery will include the elements for kidnapping and concluded that the legislature did not contemplate dual convictions under such circumstances. Id. at 306. The defendant asserts that Anthony applies to his circumstances. However, he was convicted of facilitation of first degree murder, an offense which does not necessarily entail a kidnapping. See, e.g., State v. Ralph, 6 S.W.3d 251 (Tenn. 1999) (upholding separate convictions for burglary and theft of a vehicle, noting that not every theft of a vehicle includes burglary of the vehicle). Moreover, the victim's kidnapping by which he was forcibly taken to a park where he was killed was far from incidental to the killing. The defendant's due process rights were not violated by separate convictions.

In State v. Denton, 938 S.W.2d 373, 381 (Tenn. 1996), our supreme court discussed the analysis to be used to determine whether two offenses are the same for double jeopardy purposes under article 1, section10 of the Tennessee Constitution. First, the court must determine whether each offense requires proof of an element that the other does not as provided in Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180 (1932). Denton, 938 S.W.2d at 381. Second, we must look to the specific evidence offered in the case to determine whether different evidence was used to prove each offense. Id. Third, we must consider whether there were multiple victims or multiple episodes. Id. Fourth, we must examine the purposes of the respective statutes prohibiting the defendant's conduct and determine whether the statutes serve different purposes. Id. Finally, we must conduct a balancing test of the factors in relation to each other. Id.

Especially aggravated kidnapping and facilitation to commit murder each requires elements that the other does not. Although the same conduct by the defendant would prove both especially aggravated kidnapping and facilitation to commit first degree murder of the same victim, the interests to be served by the statutes prohibiting these offenses are not the same. Unquestionably, the murder statutes protect people's lives. The interests to be served by the kidnapping statutes relate

to protecting people from being confined against their will.  One of the concerns relates to the fact that kidnapping makes victims more vulnerable to harm.  The fact that the harm occurs so as to enhance the kidnapping to an especially aggravated form and to involve another offense, such as murder, does not mean that only one conviction may be had.  In this respect, facilitating a murder is not intended to address the increased risk of harm that exists for a kidnapping victim.  Therefore, we conclude that separate convictions for especially aggravated kidnapping and facilitation of first degree murder are appropriate.

In consideration of the foregoing and the record as a whole, the judgments of conviction are affirmed.

_____
JOSEPH M. TIPTON, JUDGE