# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 17, 2002

## STATE OF TENNESSEE v. JAMES CHARLES CAVAYE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-C-1625      Steve R. Dozier, Judge**

---

**No. M2001-02154-CCA-R3-CD - Filed December 11, 2002**

---

Following a jury trial, Defendant, James Charles Cavaye, was convicted of first degree felony murder and especially aggravated robbery. He was sentenced to life imprisonment for the murder, and to a consecutive sentence of twenty-four years for the especially aggravated robbery. In this appeal as of right, Defendant contends that (1) the trial court failed to fulfill its role as the thirteenth juror; (2) the accomplice's testimony was insufficiently corroborated; (3) the trial court erred in applying enhancement factors in setting Defendant's sentence for especially aggravated robbery; and (4) the trial court erred in ordering Defendant's sentences to run consecutively. Based upon our review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**.

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Edward S. Ryan, Nashville, Tennessee, for the appellant, James Charles Cavaye.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; James F. Todd, Assistant District Attorney General; Brian Holmgren, Assistant District Attorney General; and Gigi Braun, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Background

Around 4:30 o'clock on the afternoon of January 21, 1998, Dorothy Best, a taxi driver, dropped the victim, David Schulman, off at his business, the Rainbow Room, in Printer's Alley prior to opening for the evening. The victim's usual custom was to sit at the end of the counter reading the newspaper until the bar opened. A few minutes later, Joe Reno, who was working at the bar next door, stopped by to see the victim, leaving around 5:00 p.m. The victim was a familiar figure in

downtown Nashville, and he had been a fixture in Printer's Alley for over fifty years. He was known for his generosity to the homeless who frequented the downtown area, providing those in need with cash or odd jobs from time to time. The victim normally carried change for the bar in the top pocket of bib overalls, his usual attire.

At approximately 6:00 p.m., William Jones, a salesman who serviced the bars in Printer's Alley, made a routine stop at the Rainbow Room. When he walked in, Mr. Jones did not see the victim sitting at his usual spot. He walked down the bar and spotted the victim lying on the floor, with his hands to his throat. Mr. Jones told the victim to "hang on," and ran down the alley to retrieve a police officer. The paramedics were called, and the victim was transported to the hospital where he died early the next morning.

At the time the police processed the crime scene, information on how and why the victim was attacked was scant. In addition, the premises had been disturbed by the paramedics moving some of the bar stools and knocking pictures off the wall as they carried out the victim. Only seventeen fingerprints were retrieved, none of which matched the men ultimately arrested, Jason Pence and Defendant. Blood samples were collected from a towel and the ladies' room, all of which were later determined to belong to the victim. Neither the bottles behind the bar nor the cash register were tested for prints. At the conclusion of the investigation of the premises, no physical evidence was discovered which pointed to a suspect.

Dr. John Gerber, the assistant medical examiner who performed the autopsy, testified that the cause of death was multiple incised wounds to the neck and a blunt force injury to the head. The victim was cut three times on the neck. Although the victim lost a significant amount of blood, the knife wounds were superficial, and, standing alone, would not have resulted in death unless the victim went without medical attention for an extended period of time. In addition to the knife wounds, however, the victim suffered a subgaleal hemorrhage on the left side of his head caused by a blow from a blunt instrument. At the time he was cut, the victim could still have yelled for help since the incisions did not impact the vocal chords. Although Dr. Gerber was unable to ascertain which injuries were inflicted first, the knife wounds were consistent with the perpetrator standing behind the victim. Dr. Gerber could not specify what type of knife was used or what instrument caused the skull fracture.

During the early phase of the investigation, several potential suspects were identified. The police investigated some, but not all, of the leads. After a few months, the case was reenacted on the television program, *America's Most Wanted*, in order to generate new leads. Following the first episode, Detective Al Gray testified that he received a call from Beverly Sumner, a bartender at Legend's Corner in Nashville. She reported that she had seen Defendant and Jason Pence soon after the murder, and she had a "feeling" they were somehow connected to the incident because Mr. Pence had attempted to change his appearance and Defendant was limping. On Ms. Sumner's advice, Detective Gray located Mr. Pence at the downtown library. Mr. Pence confirmed that he knew Defendant, but said that he did not know the victim and had never been in the Rainbow Room. He

acknowledged that he had changed his appearance by shaving and cutting his hair. At this time, Mr. Pence was not a suspect, and the conversation was not recorded.

While working on another homicide, Detective Gray ran into Mr. Pence once again at a hotel on Dickerson Road, and Mr. Pence asked him if he had found Defendant. A week later, Detective Gray interviewed Mr. Pence as a follow-up, but received no new information other than the fact that Defendant sometimes stayed at the Union Mission in Nashville since both he and Mr. Pence were homeless at the time. Detective Gray contacted the Mission and obtained the telephone number of Defendant's mother in Oregon. Mrs. Cavaye told him that her son had been in Oregon, but was now in Florida. She confirmed that Defendant was limping when he visited his family, which was after the victim was killed.

In November, 1999, Detective Bernard was assigned as lead detective on the case. Up until that time, the police were still operating under the assumption that the victim had died from knife wounds. In November, however, Detective Bernard learned that the cause of death was a head injury. By that time, though, the crime scene had been dismantled.

Based on information from Jules Tabor, who had seen Defendant with blood on his clothes the night of the murder, and Detective Gray's interview notes, Detective Bernard began searching for Mr. Pence who was finally located in a mental health facility in Lincoln, Nebraska. During the first interview, Mr. Pence stated that he had seen Defendant on the morning after the murder with blood on his clothes. Mr. Pence was told by Defendant that he had been in a fight while he was working as a bouncer at The Turf, another Nashville bar. Mr. Pence said that he and Defendant went to Legend's Corner that morning, where Defendant cleaned up. Afterwards, as they drank coffee, Mr. Pence stated that Defendant admitted that he had killed the victim. Detective Bernard returned to Nashville to interview Don Link, the manager of a food establishment on 4th Avenue, who had previously reported spotting two men in the parking garage near the Rainbow Room on the afternoon of the murder. Mr. Link identified Mr. Pence from a photographic lineup as one of the men he had seen.

During a second interview, Mr. Pence admitted that he actually had been involved in the robbery, that he knew the victim after working for him in 1996, and that he and Defendant planned the robbery in the parking garage across from the Rainbow Room. However, Mr. Pence said that Defendant went into the bar alone while he stayed at the front door as a lookout. Mr. Pence stated that he had heard sounds of a struggle, but did not witness the confrontation. At this point, Mr. Pence was arrested and transported back to Nashville.

On February 9, 2000, Mr. Pence changed his story and confessed that he had been present when Defendant assaulted and robbed the victim. Detective Bernard received information from Defendant's father that his son was in San Francisco. After the San Francisco police apprehended Defendant, Detective Bernard went there to interview Defendant. Following this initial meeting, Detective Bernard returned to Nashville, and Mr. Link identified Defendant as the second man in

the garage from a photographic line-up. Defendant was then placed under arrest and returned to Nashville for trial.

At trial, Mr. Pence testified that the following events occurred in connection with the victim's murder. Prior to the murder, Mr. Pence knew the victim because he used to clean the Rainbow Room's bathrooms in 1996. Five or six days before the murder, both he and Defendant decided to rob someone because they were tired of being homeless. Mr. Pence testified that it was his idea to rob the victim because he knew that the victim carried cash in the pockets of his bib overalls. On the day of the murder, Defendant and Mr. Pence met again around 5:00 p.m. to discuss the robbery in a parking garage across from the Rainbow Room. Defendant told Mr. Pence that he would beat the victim up if he did not give them the money. The two left the garage and went to the Rainbow Room.

Initially, Mr. Pence stood by the doorway as a lookout because he was concerned that the victim would recognize him. However, he left his post because he wanted to see what Defendant was going to do. When Defendant asked the victim for money, he refused. Defendant then hit the victim twice in the face, and three or four times in the stomach, knocking him off his bar stool and on to the floor. As the victim tried to rise, Defendant pulled his head back and placed a knife against his throat. Defendant asked for money again, and when the victim again refused, he cut his throat three times and let him go. Defendant reached over and removed some money from the victim's pockets, then went into the bathroom to wash the blood off his hands.

The victim cried out for help, and Defendant told Mr. Pence "to shut him up." When Mr. Pence refused, Defendant hit the victim over the head with a liquor bottle, then placed the bottle back behind the bar. After that, the victim was quiet. Defendant took some money out of the cash register, and closed the drawer. He and Mr. Pence then left the bar agreeing to meet up later that night to split the money.

Around 8:30 p.m., Defendant and Mr. Pence met at the bar, The Turf. Defendant had blood on his jeans and shirt, and was limping. Defendant gave Mr. Pence $5 out of the $45 he had taken from the victim, saying that Mr. Pence had not acted as a lookout like he was supposed to do. Around midnight, the two men separated.

The next morning, Mr. Pence spotted Defendant near Legend's Corner as Mr. Pence headed to the Union Mission for breakfast. Defendant still had on the clothes he wore the night before, and the two of them went into Legend's Corner so Defendant could wash.

Mr. Pence saw Defendant for the last time two days later during a vigil held for the victim in Printer's Alley. He and Defendant, along with a friend and her two sons, attended the ceremony. While they were there, Defendant knelt down, made the sign of the Cross, and sang "Amazing Grace."

Detective Dyer testified that on the evening of the murder she was standing at one end of Printer's Alley when Mr. Jones rushed out calling for help. She responded and found the victim lying on the floor with his throat cut. He was mumbling, and Detective Dyer removed one of his broken dentures; the other lay on the floor next to him. Detective McAlister with the Homicide Division testified that he found blood on the sink, the cabinet and the roll-down towels in the Rainbow Room's ladies restroom. Joe Minor, a forensic scientist with the Tennessee Bureau of Investigation, testified that the blood found in the bathroom belonged to the victim.

Jules Tabor worked at Legend's Corner at the time of the murder. He usually arrived at work around 6:00 in the morning to clean up the bar before it opened. He knew both Defendant and Mr. Pence, and testified that they regularly stopped by in the mornings to use the bar's bathrooms. Mr. Tabor testified that on the day after the murder Defendant and Mr. Pence stopped by as usual. Although Mr. Pence was "presentable," Defendant "was a sight," with his clothes and hair in disarray, and blood still evident on his clothes and person. Defendant was also limping. Mr. Tabor stated that Defendant told him he had been in a fight at The Turf where he worked as a bouncer. Kathleen Moore, the owner of The Turf at the time of the murder, however, testified that the club never employed bouncers.

Barbara Bruce, a friend of Defendant and Mr. Pence, also testified that she saw Defendant on the night of the murder, and he looked like he had been in an altercation, with blood on his clothes, puffiness in his face, and a hurt knee. She stated that it appeared as if Defendant had tried to clean up but had been unsuccessful. When she asked Defendant what happened, Defendant told her he had been in a fight with a homeless person. When she asked Defendant if he had heard about the victim's attack, Defendant said no, but that he wanted to visit the crime scene. She stated that they went to Printer's Alley together that night and stayed about ten minutes. Ms. Bruce testified that she saw Defendant and Mr. Pence the next evening, and they attended the vigil service for the victim.

Don Link was the manager of the Burger King on 4th Avenue. The restaurant's back door opens on to Printer's Alley, and Mr. Link testified that he went down the alley just before dark to the garage across from the Rainbow Room. He stated that it was his usual routine to move his car from the garage's top level to a spot on the first floor near the elevators for security purposes. The night of the murder, Mr. Link noticed two white men standing by the elevators. When his headlights flashed on them, the men went up the stairs. Later, looking at photographs, Mr. Link identified the two men as Defendant and Mr. Pence.

Guy Perry testified that he was Defendant's cellmate for a short period of time. Although Defendant initially denied killing the victim, Defendant later confessed to the murder, telling Mr. Perry that it was just a robbery gone bad. Mr. Perry said that Defendant only admitted hitting the victim and did not mention the knife cuts. Defendant told him that the robbery was all Mr. Pence's idea, and that they had only gotten $40 or $45 for their efforts. Mr. Perry testified that Defendant told him he had only given Mr. Pence $5 because he had not done his job properly. Mr. Perry also testified that Defendant told him that he went to the victim's vigil and sang "Amazing Grace."

On cross-examination, Mr. Perry admitted that he was released from jail early as a result of his agreement to testify in this matter, and that he had read portions of the case file Defendant had in the cell. However, Mr. Perry testified that he had told the police what he knew before the deal for his release was offered, and that he had also helped them on an unrelated homicide investigation.

Michael Hodge also was Defendant's cellmate for a period of time. Mr. Hodge testified that he was in jail on a federal weapons violation, and had not yet been sentenced when he agreed to testify. However, Mr. Hodge admitted he knew that he could get his sentence reduced if he assisted the State. Mr. Hodge testified that Defendant confessed that he and Mr. Pence went to the Rainbow Room to rob the victim, that the victim refused to give them money, and that Defendant hit him prior to robbing him. Defendant then killed the victim "because he wouldn't shut up." Mr. Hodge testified that Defendant thought he would not be convicted because there was no evidence other than Mr. Pence's testimony, and Mr. Pence was a liar with numerous conflicting statements. According to Mr. Hodge, Defendant told him he was going to open up a tattoo parlor or a bar called "The Whodunit" after he was free. Mr. Hodge testified that Defendant had shown him a newspaper clipping about the murder, and copies of Mr. Pence's various statements and letters concerning the case.

The jury convicted Defendant of first degree felony murder and especially aggravated robbery.

On appeal, Defendant first contends that the trial court failed to exercise its role as the thirteenth juror when it denied Defendant's motion for a new trial. Defendant argues that there was no direct evidence linking him to the crime. He argues that the State's proof was derived primarily from the testimony of his accomplice, Mr. Pence, who admitted lying on several occasions, and the testimony of two cellmates who testified in exchange for more lenient sentencing. Moreover, Defendant contends that the State neglected to follow up on numerous suspects, and therefore failed to identify the true perpetrator of the crime. Accordingly, Defendant argues, the weight of the evidence does not support the jury's verdict.

Secondly, Defendant argues that the trial court erred in applying enhancement factors when determining Defendant's sentence for especially aggravated robbery, and erred in finding that Defendant's sentences should be served consecutively.

## II. Thirteenth Juror.

Defendant contends that the trial judge should have overturned the jury's verdict as the thirteenth juror because the verdict was against the weight of the evidence. As a result, Defendant now asks that this matter be remanded for a new trial. In his argument, Defendant relies on several cases that stand for the proposition that a trial court's findings of fact will be upheld unless the evidence preponderates against those findings. *See State v. Simpson*, 968 S.W.2d 776 (Tenn. 1998); *State v. Henning*, 975 S.W.2d 290 (Tenn. 1998); *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). However, Defendant's reliance is misplaced. The standard of review applied to a challenge that a

trial court failed to perform its thirteenth juror role is different from that employed in challenges to a trial court's findings of facts.

As a thirteenth juror, the trial court may grant a new trial following a guilty verdict if the trial court disagrees with the jury about the weight of the evidence. Tenn. R. Crim. P. 33(f). In that situation, the trial court assesses the weight of all of the evidence presented at trial, and either approves or disapproves the verdict reached by the jury. The purpose of the thirteenth juror rule is to provide a safeguard against a miscarriage of justice by the jury. It ensures that the verdict is based on satisfactory evidence presented through credible witnesses. *State v. Moats*, 906 S.W.2d 431, 434 (Tenn. 1995); *State v. Nail,* 963 S.W.2d 761, 765 (Tenn. Crim. App. 1997). Indeed, it is mandatory that the trial judge perform this function, and the trial judge's approval of the verdict is necessary to the imposition of a valid judgment. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995).

The trial judge, like the jury, has the same opportunity to observe the demeanor of the witnesses while testifying and assess their credibility. *Moats*, 906 S.W.2d at 431. This Court is not in the best position to review the weight and credibility of the witnesses' testimony, and, for that reason, a new trial will only be granted if the trial judge expresses dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or the record indicates that the trial court misunderstood its role as thirteenth juror. *Id.* at 435; *State v. Gillon,* 15 S.W.3d 492, 501 (Tenn. Crim. App. 1997); *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). If the trial court simply overrules Defendant's motion for a new trial, this Court may presume that the trial judge has acted as the thirteenth juror in approving the jury's verdict. *Carter,* 896 S.W.3d at 122. The limited review afforded this Court on the performance of the trial court's thirteenth juror role, therefore, "practically foreclose[s] assessment of the evidentiary basis for a trial court's thirteenth juror ruling." *Burlison*, 868 S.W.2d at 719.

Defendant argues that the testimony of his accomplice, Mr. Pence, was not credible because the evidence showed that Mr. Pence had lied on numerous occasions about the events surrounding the victim's murder. Both sides, however, extensively examined Mr. Pence's motives and conduct before and after the murder at trial.

Defendant raises the same credibility issues with Mr. Perry's and Mr. Hodge's testimony. Defendant argues that since both men were incarcerated and received leniency on their sentences as a result of their testimony, they could not give credible testimony. Once again, both Defendant and the State questioned the witnesses about their motives, and the terms of their agreements with the state and federal governments. Defendant, through cross-examination, established that the witnesses had seen certain pieces of evidence from Defendant's files prior to testifying.

Defendant also argues that the police failed to follow up on all of the tips and information developed during the course of their investigation. To support his argument, Defendant points to various examples of potential suspects and unexplored tips, although he does not indicate what testimony or evidence might have been brought to light through their disclosure. However, the

failings or shortcomings of the police, if any, during their investigation involves the credibility of the police witnesses and the credibility of the State's case as a whole.

At the conclusion of the witnesses' testimony, it was the trier of fact's role to decide whether the testimony was credible and what weight to accord the testimony. We presume that the jury resolved any conflicts in the witnesses' testimony in favor of the State, and the jury accredited the witnesses' testimony when it returned a guilty verdict. *State v. Jackson*, 52 S.W.3d 661, 666 (Tenn. Crim. App. 2001). Therefore, our review is limited to whether or not the trial court disagreed with the verdict or misunderstood its role as the thirteenth juror. The record reflects that the trial court summarized the proof at length, including the witnesses' testimony and the investigation by law enforcement. When denying Defendant's motion for a new trial, the trial court concluded that the weight of the evidence supported the jury's verdict, stating that he believed there was "sufficient proof for these findings." The accuracy of the trial court's thirteenth juror determination is not subject to appellate review. *Moats,* 906 S.W.2d at 435. At no point did the trial court express any disagreement or dissatisfaction with the verdict. The record adequately shows that the trial court fulfilled its role as thirteenth juror.

Although Defendant phrases his issue in terms of whether the trial court properly exercised its thirteenth juror role, he also argues that the evidence was insufficient to support his convictions. This argument is based on the contention that there was no direct evidence linking Defendant to the crime. Although the State did not introduce any physical evidence that tended to place Defendant in the Rainbow Room at the time of the victim's murder, Mr. Pence's testimony, if corroborated, certainly provides direct evidence that Defendant not only was present at the crime but was the person who committed the crime. Whether or not an accomplice's testimony can sustain a conviction is a matter of the sufficiency of the independent evidence corroborating the testimony, not just the credibility of the accomplice. *See Jackson,* 52 S.W.3d at 661; *State v. Bigbee,* 885 S.W.2d 797, 803 (Tenn. 1994) (A conviction in Tennessee cannot be based on the testimony of an accomplice if uncorroborated.).

When considering the sufficiency of the evidence, the jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight afforded the evidence and the resolution of factual issues are left to the trier of fact. *State v. Keough*, 18 S.W.3d 175, 180-181 (Tenn. 2000), *cert. denied,* 531 U.S. 886, 121 S.Ct. 205, 148 L.Ed.2d 144 (2000). Therefore, on challenges to the sufficiency of the evidence, our standard of review is whether a rational trier of fact could have found all of the essential elements of the crime beyond a reasonable doubt when viewing the evidence "in the light most favorable to the prosecution." *Jackson,* 52 S.W.3d at 666 (Tenn. Crim. App. 2001), *citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

A jury's guilty verdict removes Defendant's presumption of innocence enjoyed at trial, imposing instead a presumption of guilt, and Defendant has the burden of overcoming this presumption on appeal. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991)*; State v. Tuggle,* 639

S.W.2d 913, 914 (Tenn. 1982). A guilty verdict will be set aside if the evidence is insufficient to support the trier of fact's findings beyond a reasonable doubt. Tenn. R. App. P. 13(e).

Therefore, we must determine if there was sufficient evidence corroborating the accomplice's testimony. The corroborating evidence must be entirely independent of the accomplice's testimony and lead to an inference that Defendant was involved in the crime. *Bigbee,* 885 S.W.2d at 803. Not every item of the accomplice's testimony, however, must be corroborated, and the corroborating evidence, in and of itself, does not have to be sufficient to support a conviction. *Hawkins v. State,* 469 S.W.2d 515, 520 (Tenn. 1971); *State v. Heflin*, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999).

The jury convicted Defendant of first degree felony murder and especially aggravated robbery. As charged, felony murder required proof that Defendant killed the victim during the perpetration of a robbery. The especially aggravated robbery charge required proof that Defendant intentionally or knowingly committed theft of property from the victim, by violence or placing the victim in fear, accomplished with a deadly weapon, and where the victim suffers serious bodily injury. Tenn. Code Ann. §§ 39-13-202, 39-13-403 and 39-13-403. With that in mind, we review the evidence in a light most favorable to the State.

Mr. Pence testified that he and Defendant met in the parking garage across from the Rainbow Room to finalize the robbery plans a few minutes before entering the victim's establishment. Mr. Link testified that he saw two men standing by the elevators of the parking garage around dark on the evening of the murder when he moved his car from the top floor to the bottom level. Later, he identified the two men as Mr. Pence and Defendant. Mr. Pence testified that the victim was alone in the bar when he and Defendant entered the premises. Dorothy Best testified that the victim entered the Rainbow Room alone after she dropped him off in her taxicab at 4:30 the afternoon of the murder, and Mr. Reno, a friend of the victim who visited him shortly before the murder, testified that the victim was alone when he left at approximately 5:00 p.m.

Mr. Pence further testified that, during the robbery, Defendant slashed the victim's throat two or three times and hit him on the head with a bottle. The testimony of Dr. Gerber, the assistant medical examiner, confirmed these injuries from the autopsy of the victim. Mr. Pence also testified that Defendant was spattered with blood from the wounds inflicted on the victim and later washed his face and hands in the ladies' restroom at the rear of the bar. Mr. Minor, a forensic scientist, testified that the blood samples taken from the sink, cabinet and towels in the bathroom belonged to the victim. Although Defendant tried to clean himself up, he still had blood smears on the thighs of his blue jeans as well as his shirt when Defendant and Mr. Pence left the Rainbow Room. Elaine Pittman, a bartender at The Turf, and Barbara Bruce, Defendant's friend, testified that they each saw Defendant the night of the murder and that he had blood stains on his clothes and was limping. Mr. Pence testified that he and Defendant went to Legend's Corner the next morning so that Defendant could wash up. Jules Tabor, the janitor at Legend's, testified that Defendant was a "sight" with blood on his clothes. Mr. Tabor stated that Defendant told him he had been in a fight the night before at The Turf where he was working as a bouncer. Kathleen Moore, the owner of The Turf, testified that she never employed bouncers.

Finally, Defendant's two cellmates, Michael Hodges and Guy Perry, each testified that Defendant had confessed to robbing and killing the victim. Mr. Perry testified that Defendant said that he and Mr. Pence, at Mr. Pence's suggestion, had gone to the Rainbow Room merely to rob the victim, but the attempt went wrong, and Defendant ended up killing the victim. Mr. Perry said that Defendant only said he hit the victim, and did not mention cutting him with a knife. He stated that Defendant said he only got $40 from the victim, and that he gave $5 to Pence. Mr. Perry testified that Defendant later went to Printer's Alley with a woman and her two sons and sang "Amazing Grace."

Mr. Hodge's testimony was essentially the same. He testified that Defendant told him that it was Mr. Pence's idea to rob the victim since he knew the victim carried money in his bib overalls. Mr. Pence went in first to make sure that the victim was alone, then stood lookout while Defendant went to ask for money. Mr. Hodges testified that Defendant said he then got into a struggle with the victim while he was attempting to rob him, and that Defendant ended up cutting his throat.

Based on the testimony presented at trial, we conclude that Mr. Pence's testimony was sufficiently corroborated, and there was sufficient evidence to sustain Defendant's conviction on both counts. Defendant is not entitled to relief on this issue.

## III. Sentencing Issues.

Defendant was sentenced to life imprisonment with the possibility of parole for the murder conviction. Following a sentencing hearing, Defendant was sentenced as a Range I standard offender, to twenty-four years for the especially aggravated robbery conviction, with that sentence to run consecutively to the life sentence.

Especially aggravated robbery is a Class A felony. Tenn. Code Ann. § 39-13-403(b). As a Range I standard offender, the sentencing range for especially aggravated robbery is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). The presumptive sentence for a Range I standard offender convicted of a Class A felony is the midpoint of the range if there are no mitigating or enhancing factors. Tenn. Code Ann. § 40-35-210(c). Should there be enhancement but no mitigating factors for a Class A felony, then the court shall set the sentence at or above the midpoint of the range. Tenn. Code Ann. § 40-35-210(d). Should there be mitigating but no enhancement factors for a Class A felony, then the court shall set the sentence at or below the midpoint of the range. *Id.* Should there be enhancement and mitigating factors for a Class A felony, the court must start at the midpoint range, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e). The weight accorded the enhancement factors is within the trial court's discretion so long as the record supports its findings and the findings comply with sentencing principles. *State v. Carter*, 908 S.W.2d 410, 412 (Tenn. Crim. App. 1995).

In setting Defendant's sentence at twenty-four years, the trial court considered as enhancement factors that (1) Defendant was a leader in the commission of an offense involving two

or more criminal actors, (2) Defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense, (3) Defendant had a previous history of unwillingness to comply with the conditions of a sentence involving release into the community and (4) Defendant had a previous history of criminal convictions or criminal behavior. Tenn. Code Ann. § 40-35-114(1), (2), (5), and (8). The trial court found no mitigating factors. After determining the length of Defendant's sentence, the trial court ordered the sentence for Defendant's especially aggravated robbery conviction to run consecutively with the life sentence previously imposed for the murder conviction based upon a finding that Defendant was a dangerous offender. *See* Tenn. Code Ann. § 40-35-115(b)(4).

On appeal, Defendant argues that the trial court improperly applied an enhancement factor based on exceptional cruelty because the State failed to prove any exceptionally cruel acts over and above those factors that relate to the elements of an especially aggravated robbery offense. We note that Defendant in his brief also argues that the trial court improperly applied an enhancement factor based on the age of the victim, but the record does not support this contention. Rather, it appears the trial court merely stated that the age of the victim, while not supporting application of a separate enhancement factor, was considered by the trial court in determining whether Defendant acted exceptionally cruelly.

Defendant also argues that the trial court erred in ordering Defendant's sentence for especially aggravated robbery to run consecutively to his life sentence. Defendant argues he is not a dangerous offender as contemplated by the applicable statute, and the State offered no proof that the consecutive sentencing of Defendant was necessary to protect the public from future criminal acts upon Defendant's release.

When a defendant challenges the length of a sentence, this court conducts a de novo review on the record, with a presumption that the trial court's determinations are correct if the record shows that the trial court considered both the principles and purposes of the 1989 Sentencing Act and all relevant facts. Tenn. Code Ann. § 40-35-401(d)*; State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991). The defendant carries the burden of proving the sentence improper. Sentencing Commission Comments to Tenn. Code Ann. § 40-35-401(d). In reviewing the length of the sentence, this court must consider: (1) the evidence presented at the trial and sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any appropriate enhancement and mitigating factors; and (6) any statements made by the defendant on his own behalf. Tenn. Code Ann. § 40-35-210(b).

Enhancement factors must be appropriate for the offense and "not themselves essential elements of the crime." Tenn. Code Ann. § 40-35-114; *State v. Poole*, 945 S.W.2d 93, 95 (Tenn. 1995). Therefore, the presence of a particular enhancement factor may not be based on facts that prove or establish the elements of the offense. *State v. Jones*, 883 S.W.2d 597, 601 (Tenn. 1994). It is presumed that the Legislature took these factors into consideration when setting the range applicable to the offense. *Id.*

The offense of especially aggravated robbery is defined as a robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403. Defendant, therefore, argues that the facts used by the trial court to establish Defendant's exceptional cruelty toward the victim are the same facts necessary to support a finding that the victim incurred serious injury based on this Court's decisions in *State v. Embry,* 915 S.W.2d 451 (Tenn. Crim. App. 1995), *overruled in part by State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000); *State v. Williams*, 920 S.W.2d 247 (Tenn. Crim. App. 1995); and *State v. Manning*, 883 S.W.2d 635 (Tenn. Crim. App. 1994). In each of these rape cases, this Court concluded that the factors relied upon to establish the presence of exceptional cruelty were the same factors which established the elements of the rape offense, and, therefore, by themselves, would not support a finding that the defendants acted with exceptional cruelty. However, based upon a review of the record, these cases are not persuasive to the issues at hand.

Exceptional cruelty is not an element of especially aggravated robbery. *Poole*, 945 S.W.2d at 98. Defendant's actions, therefore, may exceed those necessary to support a finding that the victim sustained serious bodily injury, and may demonstrate a culpability "distinct from and appreciably greater than that incident to the offense." *Spratt*, 31 S.W.2d at 607. In this instance, the victim was cut three times on the neck and rendered senseless by a blow to the head with a liquor bottle. These factors certainly establish that the victim suffered serious bodily injury. However, the trial court also found that Defendant's actions went beyond merely inflicting injury on the victim. Specifically, after slashing the victim's throat three times, Defendant removed money from the victim's pocket and then allowed the victim to lay on the floor without medical attention while he washed his hands in the bar's restroom. At this point, the victim was helpless either to flee for help or resist any further steps Defendant might take to remove money either from his person or the cash register. Defendant could simply have completed the robbery without interference and left the premises. Yet Defendant first told Mr. Pence to silence the victim, and when Mr. Pence did not respond, came back and struck the victim a second time just to "shut him up." We conclude that Defendant's actions of striking the victim on the head with the bottle after all danger of resistance on the victim's part was removed and allowing the victim to lay on the floor for an extended period of time while Defendant cleaned the blood off his hands represents a culpability greater than that incident to the offense and justifies application of this enhancement factor.

Defendant next argues that the trial court erred in imposing consecutive sentences because there was no proof that Defendant was a dangerous offender or that consecutive sentences are necessary to protect the public.

When a defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to run consecutively if certain criteria are met. Tenn. Code Ann. § 40-35-115. In this instance, the trial court found that Defendant was a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). However, if the trial court rests its determination of consecutive sentencing on this category, the court must make two additional findings. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). First, the trial court must find that an

extended sentence is necessary to protect the public from further criminal conduct by the defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offense. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

The record indicates that the trial court properly considered the requirements set forth in *Wilkerson* in determining whether consecutive sentencing was appropriate for Defendant. In making its determination, the trial court considered the viciousness of Defendant's attack, the complete indifference for the victim's agony as Defendant washed the victim's blood off his hands, the senseless infliction of a second injury after the victim was immobilized, and the fact that Defendant committed the offense for only $45.00. Furthermore, the trial court concluded that Defendant showed no remorse for his crime, and even joked about the crime to his cellmate saying he was going to open a bar called "The Whodunit." The trial court then compared the circumstances of Defendant's crime to the court's other sentencing hearings, and concluded that consecutive sentencing was reasonably related to the severity of the case and necessary for the protection of the public.

Because our review indicates that the trial court considered the relevant sentencing criteria, made findings of fact that are adequately supported in the record, and followed the statutory sentencing procedure, we conclude that the trial court did not abuse its discretion when it ordered Defendant's sentence for especially aggravated robbery to run consecutively with his life sentence. Defendant is not entitled to relief on this issue.

### CONCLUSION

Based upon our review of the record, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE