IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 6, 2002

## STATE OF TENNESSEE v. DAVID EARL PALMER

**Direct Appeal from the Circuit Court for Carroll County**
**No. 01CR-1650     C. Creed McGinley, Judge**

---

**No. W2001-02515-CCA-R3-CD - Filed December 13, 2002**

---

Defendant, David Earl Palmer, was convicted by a jury of aggravated burglary and aggravated rape. The trial court sentenced Defendant to five years for the aggravated burglary conviction and twenty-five years for the aggravated rape conviction. In his appeal, Defendant contends that the evidence presented at trial was insufficient to sustain either conviction. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, and JOHN EVERETT WILLIAMS, JJ., joined.

Victoria DiBonaventura, Paris, Tennessee (at trial) and Guy T. Wilkinson, District Public Defender; and Billy R. Roe, Jr., Assistant Public Defender, Camden, Tennessee (on appeal) for the appellant, David Earl Palmer.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; G. Robert Radford, District Attorney General; and Eleanor Cahill, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

During the evening of October 16, 2000, the victim, Kimberly Matlock, fell asleep on the couch with her two-year-old son while watching television. Earlier, her husband had stopped by for dinner. Though the couple was separated, the victim's husband often came by to see the children. He left around 7:30 p.m., and the victim's roommate at the time was out for the evening. Sometime later, the victim woke up when Defendant covered her face with a tee-shirt and told her to do what he wanted if she did not want to die. Defendant dragged the victim to her bedroom, put her on the bed, and tied her hands with a cord cut from an iron.

During the struggle, the victim's son woke up and began crying. Her nine-year-old daughter came to the door and asked the victim why she did not come get the baby. Defendant told the victim to quieten the children or he would kill them. The victim called out for her daughter to give the baby a bottle, and she heard the children settle down on the couch in the living room. Defendant removed the victim's shorts and performed oral sex on her, then penetrated her. During this time, he told her he knew her husband, and that he had been watching her. He told the victim he loved her, but knew that she would not have anything to do with him, so he had to rape her. At some point, the victim tried to loosen the tee-shirt around her face so she could breathe better, and Defendant struck her on the jaw.

After he was through raping her, Defendant pulled the victim into the bathroom and placed her in the bathtub. He turned on the water and attempted to wash her lower body. When Defendant was finished, he closed the shower door, turned off the lights, and left the room, telling the victim he would kill her if she called the police. The victim waited a few minutes until everything was quiet, then wrapped a towel around herself. She telephoned her mother and told her she had been raped.

Her mother, Phyllis Guttilla, lived only a couple of blocks away and arrived within a few minutes to find her daughter hysterical and the children upset. Ms. Guttilla called 911 between 11:30 and 11:45 p.m. After the police questioned the victim for a few minutes, she was transported to the hospital where a rape kit was performed and a blood sample taken. All the victim could tell the police about the rapist was that he was an Afro-American because she saw his bare arm, and that he had a deep voice. The victim later testified that she had never met Defendant.

The next day, the victim returned to her home. The night before, she had left her purse on the kitchen table, and found it that morning under her bed. She discovered that her checks and prescription medicine were missing. One of her cordless telephones was discovered in the baby's bed under some blankets and pillows. At the back of the apartment, a window screen lay on the ground, and a rain bucket was turned upside down beneath her bedroom window. The fan that had previously been in her bedroom window now lay on the floor. None of the fingerprints lifted at the scene matched Defendant's.

At trial, Mr. Greg Bookout, a member of the McKenzie police force, testified that the victim was crying and hysterical when he arrived in response to the 911 call. When the victim entered the hospital, the attending nurse, Reba Montgomery, noted that the victim was crying when she was first admitted, then became quiet and withdrawn. Mr. Bookout and Ms. Montgomery both noticed the red marks around the victim's wrists. The victim's physician, Dr. Amanda Reiter, said that the victim was distraught when she sought attention for her jaw two days later. The swelling was visible from ten feet away, and Dr. Reiter prescribed Darvocet to alleviate the pain.

Lt. Tim Nanney interviewed Defendant on October 19, and Defendant gave a statement as to his activities on the night of the rape. In his statement, Defendant said that he visited Janice Pullum that night, leaving around 10:15 or 10:30. After he arrived home at about 11:10, he went to

bed and did not leave again until early the next morning. Defendant consented to a DNA testing and the drawing of a blood sample. The testing revealed that the spermatozoa present in the victim's vaginal swabbing belonged to Defendant.

At trial, Janice Pullum testified that she had known David Palmer all her life. On the night of the rape, Defendant arrived at her house around 7:30 or 8:00 p.m. Although in her testimony, Ms. Pullum said that Defendant left between 8:30 and 9:00 p.m., she put the time closer to 10:00 p.m. in a prior statement to the police. She ultimately admitted at trial that she was not sure when Defendant left.

Another friend of Defendant's, Ronald Pate, testified that he arrived home from working the late shift around 12:10 a.m. Just as he was settling down to watch television, Defendant knocked on the door. The two men talked for a few minutes, and then Defendant left.

Defendant took the stand in his own defense at trial, and drew a completely different picture of the events occurring on October 16, 2000. According to Defendant, he first met the victim some time in late August or early September. One day, while he was standing on a street corner, the victim drove by, stopped, and asked Defendant if he had any drugs. During this time, Defendant often acted as a runner, or a person who purchases drugs for buyers who do not have a connection with a drug dealer. Defendant said he did this for sex or to obtain drugs, but not for money.

During his first contact with the victim, Defendant directed her toward a park where he purchased cocaine from James Haines. The victim gave him a small amount of drugs as payment, and they smoked the drugs together. The victim told him her name was Candy. A couple of weeks later, the victim drove by Defendant's street corner, this time accompanied by a female friend, and, once again, Defendant procured drugs for her. On one of their encounters, the victim stopped by her apartment while Defendant waited in the car. Around the first of October, however, Mr. Haines refused to sell any more drugs to the victim, because he did not know her.

On October 16, 2000, the victim stopped Defendant as he was walking home from Ms. Pullum's house. She asked him if he had any drugs. When he said he did not, the victim told him to come over to her house if he was able to purchase any drugs. After she left, Defendant secured some drugs from Mr. Haines, and went to the victim's apartment. When he knocked on the back door, the victim let him in, and he followed her into the living room where she had been sitting with her son. They talked for a few minutes, and Defendant gave her a small piece of cocaine. She asked for more, but Defendant replied that he would not give her any more until she had sex with him.

The victim and Defendant went into her bedroom where they first had oral sex and then intercourse. When they were finished, the victim yelled at her daughter to bring her cigarettes to the bedroom door. The victim opened the door wide enough to retrieve the cigarettes, and then went into the bathroom to wash. Defendant got ready to leave and admitted he did not have any more drugs. The victim became very angry.

-3-

Defendant testified that he did not know the victim's real name until he saw it written on the arrest warrant. When asked whether anyone had seen him with the victim, Defendant said that Mr. Haines had seen the victim and her friend with Defendant one night. However, Mr. Haines did not testify at trial. Defendant felt that the victim had accused him of rape because she was mad that he reneged on his promise to give her drugs in exchange for sex.

In rebuttal, Joy Alexander, Shamira Taylor and the victim's husband all testified that they had know the victim for years and had never known the victim to use drugs or leave her children alone in the apartment at night.

At the conclusion of the testimony, the jury convicted Defendant of aggravated burglary and aggravated rape.

In his appeal, Defendant contends that the evidence was insufficient to sustain his convictions because the jury entirely disregarded Defendant's testimony. A rational jury, the Defendant argues, would not have found him guilty of the charges in the face of so many other viable alternatives. We disagree.

On challenges to the sufficiency of the evidence, our standard of review is whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt when viewing the evidence in a light most favorable to the prosecution. *State v. Jackson* 52 S.W.3d 661, 666 (Tenn. Crim. App. 2001), *citing Jackson v. Virginia*, 443 U.S.307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A jury verdict is accorded great weight in criminal trials. Once a jury finds a defendant guilty, his presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984).

Defendant essentially asks us to reevaluate and reweigh the credibility of his and the victim's testimony. However, questions concerning the credibility of witnesses, the weight afforded the evidence, and the resolution of factual issues are left to the jury. *State v. Keough*, 18 S.W.2d 175, 180-81 (Tenn. 2000), *cert. denied* 531 U.S. 886, 121 S.Ct. 205, 148 L.Ed.2d 144 (2000). A conviction may be supported by the testimony of the victim alone. *Montgomery v. State*, 556 S.W.2d 559 (Tenn. Crim. App. 1977), *perm. to appeal denied* (Tenn. 1997); *Letner v. State*, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974); *see also State v. McKnight*, 900 S.W.2d 36, 48 (Tenn. Crim. App. 1994), *perm. to appeal denied* (Tenn. 1995). This Court will only displace the jury's assessment of the witness' credibility if the testimony is entirely irreconcilable with the physical evidence, or "so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon." *State v. Hornsby*, 858 S.W.2d 892, 894-95 (Tenn. 1993); *Letner*, 512 S.W.2d at 649.

Defendant was convicted of aggravated rape which, as charged in this case, is the unlawful sexual penetration of a victim during which the defendant causes bodily injury to the victim. Tenn. Code Ann. § 39-13-502(a)(2). "Sexual penetration" includes sexual intercourse and cunnilingus. Tenn. Code Ann. § 39-13-501(7). Defendant was also convicted of aggravated burglary which is the nonconsensual entry into a habitation with the intent to commit a felony, in this case, aggravated rape. Tenn. Code Ann. §§ 39-14-402(a)(1) and 39-14-403. We conclude that the victim's testimony at trial set forth the essential elements of both offenses. Moreover, the victim's testimony was corroborated through medical testimony and the investigations conducted by the police. There was sufficient evidence to prove Defendant's guilt beyond a reasonable doubt. Defendant and the victim clearly presented the jury with two completely different versions. Obviously, the jury accredited the victim's testimony and discredited Defendant's.

## CONCLUSION

After a thorough review of the record, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE