IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 18, 2007

## STATE OF TENNESSEE v. EDWARD POE

**Appeal from the Circuit Court for Marion County**
**No. 6142     J. Curtis Smith, Judge**

---

**No. M2007-01714-CCA-R3-CD - Filed March 17, 2008**

---

A Marion County Circuit Court jury convicted the defendant, Edward Poe, of one count of manufacturing a controlled substance, one count of attempted possession of a controlled substance with intent to sell, and one count of felony possession of drug paraphernalia.  On appeal, he alleges that a directed verdict should have been granted based on the insufficiency of evidence as a whole, as well as based on insufficient evidence for the paraphernalia charge because there was no proof of intent to deliver the paraphernalia.  He also alleges that the convictions for manufacturing a controlled substance and felony possession of drug paraphernalia were inconsistent and that the court should not have excluded testimony from a court clerk regarding the filing of the January 23, 2002 search warrant.  Upon review, we affirm the judgments as modified.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed as Modified**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Paul D. Cross, Monteagle, Tennessee, for the appellant, Edward Poe.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Finley, Assistant Attorney General; and Sherry Gouger, Assistant District Attorney, for the appellee, State of Tennessee.

### OPINION

On June 3, 2002, the Marion County Grand Jury indicted the defendant on one count of manufacturing a controlled substance, *see* T.C.A. § 39-17-417(a)(1) (1997), one count of possession of a controlled substance with intent to sell, *see id*., § 39-17-417(a)(4), and one count of felony possession of drug paraphernalia, *see id.,* § 37-17-425(b)(1).

The trial was held on April 25, 2003.  Marion County Deputy Gene Hargis testified that on January 23, 2002, he assisted Detective Brent Myers in the search of the mobile home of Donnie Keahey.  Detective Hargis testified that he had received over one hundred hours of training

on methamphetamine manufacturing operations (MMOs) and personally had been in contact with over three hundred MMOs in the previous five years. Upon arrival at Mr. Keahey's residence, the officers knocked on the door and identified themselves as police with a warrant. No one responded while they knocked for two minutes. Detective Hargis testified that they "could hear movement inside the residence like somebody walking back and forth." After forcing the trailer door open, they found the defendant, Mr. Keahey, and Stacy McHone inside.

Deputy Hargis said that Mr. Keahey's trailer had "a very strong odor of methamphetamine cook" and "a light haze in the residence kind of like a light cloud." During a safety sweep of the residence, he observed a coffee pot on a hot plate that appeared to be cooking and was hot to the touch. Officers disengaged the power supply to the hot plate. In the kitchen area, officers discovered in the dishwasher a full rack of quart and pint jars with "white powder residue inside [the jars, and] some had red powder residue inside, but it was inside the dishwasher." They also found a white sack containing items commonly used in the manufacturing of methamphetamine. Detective Hargis took six samples of various liquids and residue found in the bedroom and kitchen areas of the residence that were consistent with the manufacturing process for methamphetamine. The samples were removed from the residence and taken to the Tennessee Bureau of Investigation (TBI) crime lab for analysis.

On cross-examination, Deputy Hargis testified that he could not remember for sure if the trailer door was forced open or if the occupants opened it. He said it was not the first search of Mr. Keahey's residence, which had been searched on November 27, 2001, and February 20, 2002. Detective Hargis testified that the officers did not expect to find the defendant at Mr. Keahey's residence at the time of the January 23, 2002 search and that the defendant was not observed engaging in the manufacture of methamphetamine.

TBI forensic scientists David Brown and Adam Gray testified that they received samples recovered from the January 23, 2002 search of Mr. Keahey's residence. The samples tested positive for methamphetamine.

Whitwell Chief of Police Brent Myers testified that at the time of the search he was working in the Marion County Sheriff's Department as Chief Detective. Detective Myers had undergone methamphetamine training at the Drug Enforcement Agency (DEA) academy, was licensed to teach about safety and awareness of methamphetamine, and had observed approximately 150 MMOs. His training included learning the process for manufacturing methamphetamine in the National DEA Academy training lab. He then described the procedure for "cooking" methamphetamine, explaining the process and the items needed. Detective Myers testified that all the necessary items were present in Mr. Keahey's residence during the January 23, 2002 search.

Detective Myers testified that after knocking on the front door of Mr. Keahey's residence and receiving no answer, the officers heard noise inside. Detective Myers went to the rear of the mobile home because "it sounded to me like they were trying to run out the back." When there was no answer at the back door, he went back to the front door and "kicked the door open[.]"

He testified that the residence was filled with smoke and fumes, to the degree that "it was burning my skin and irritating my eyes." In a room adjacent to the living room, he found coffee filters being heated on a hot plate and a paper bag "located in front of the hot plate that had a white powder residue . . . in that bag." Various items consistent with methamphetamine manufacturing were found in the kitchen, including a Pyrex baking dish with red phosphorus liquid. He testified that the television was definitely off when they entered the residence because they later turned it on while waiting for the "haz mat" team to arrive and clean up the site.

Detective Myers testified that the following items were seized from Mr. Keahey's residence:

Three Propane Canisters 16.4 ounces, two boxes of Rock Salt, two 32 ounce Peroxide bottles, seven 16 ounce Peroxide bottles, one 32 ounce Rubbing Alcohol, one Muriatic Acid bottle 32 ounces, one Tincture of Iodine 16 ounce, two 12 ounce Gas Line Antifreeze, four 12 ounce Heet bottles, seven 12 ounce Pitt Gas Line Antifreeze, three gallon cans of Coleman Fuel, 25 cans 11 pound three ounce CRC Brake Cleaner, one quart of Liquid Fire, Ten 18 ounce Red Devil Lye, one quart Rooto Drain Cleaner, three 11 ounce cans of Gunk Start Fluid, one 11 ounce can of Instant Starting Fluid, three 11 ounce Peak Starting Fluid, four 11 Pyroil Starting Fluid, two one quart cans Parks Acetone, two 30 ounce cans of Clean Strip Acetone, one gallon EZ Acetone, one gallon Parks Acetone, one quart Sunny Side Denatured Alcohol, one 26 ounce Iodized Salt, one roll Reynolds Aluminum Foil, 32 Blister Packs Nasal Decongestant, 1 plastic container with Match Striker Plates, Matches, used coffee filters, 3 pair of rubber gloves, 2 boxes Suphedrine 24 count 30 milligram, three bottles T and M Mini-Thin 100 count 25 milligram, 13 CVS Brand Nasal Decongestant 24 count 60 milligram, 37 Walact Cold and Allergy Medicine 48 count 60 milligram, three boxes Walact Cold and Allergy Medicine 24 count 60 milligram, 12 Walfed Coal [sic] and Allergy Medicine 48 count 60 milligram, one roll Duct Tape, three boxes of .45 caliber rounds, one box of .38 caliber rounds, one gram of a white powder substance, one hot plate, Aluminum foil bullet, one coffee pot with boiling filters . . . . One empty coffee pot, seven pint jars with white residue, seven quart jars with white residue, two pound [sic] of Iodine . . . crystals. One glass baking dish with red residue, one glass baking dish with Red Phosphorus, assorted tubing, one set of scales, two glass smoking pipes, eight 20 ounce condenser bottles, four 2 liter condenser bottles, one gallon gassing bottle, one pint 2 layer liquid Orange and White, one quart with soaking striker plates.

Those items were recovered from "the kitchen and the laundry room" of the residence, with "the back side of the kitchen" containing the bulk of the items. The hot plate and the previously described paper bag were found in the bedroom.

On cross-examination, Detective Myers testified he mistakenly gave defense counsel a search warrant return for the February 20, 2002 search of the residence. He later mailed counsel a copy of the correct warrant. On average, Detective Myers would execute between 25 and 30 search warrants per year. Detective Myers said he did not know why defense counsel could not find a copy of the January 23, 2002 return at the clerk's office but insisted it had been properly filed. He testified that he was not getting details of the January and February searches confused. He distinctly remembered the January search because when kicking the door open he "fell backwards and down the steps," breaking his ribs. He said the defendant was not doing anything overtly illegal when the officers entered, no weapons or electronic devices used for transactions or avoiding law enforcement officers were found, and there was "no proof" that any of the drug paraphernalia was being used in any way other than for the manufacture of methamphetamine.

After the State rested, the defense attempted to call Marion County Circuit Court Clerk Linda Willis, but the State objected on the ground of relevance. Defense Counsel stated Ms. Willis would provide more information on the January warrant not being filed. The court found the potential testimony of Ms. Willis irrelevant and that any probative value of her testimony was outweighed by the potential to confuse the jury.

The defense then called the defendant, who testified he lived with his mother about three miles away from Mr. Keahey's residence. He had known Mr. Keahey since kindergarten and had met Ms. McHone "maybe a year" before the trial through mutual friends. The defendant testified he visited Mr. Keahey's residence to socialize "[q]uite often," and they would "search the web on the computer, play special games, work on vehicles, just anything."

The defendant said that on January 23, 2002, he had been at Mr. Keahey's residence "approximately an hour, could have been longer" before the police arrived. He left his jacket on the kitchen table. They ate a pizza cooked in the oven by Mr. Keahey, and afterwards the defendant hand-washed the dishes and put them back in the cupboard. "[R]ight after [they] got through eating," they heard a knock on the door. The defendant testified Mr. Keahey got to the door "as quick as he could" but was slowed by his arthritis. The defendant said he saw no methamphetamine materials and did not smell anything funny in the residence. He denied seeing the hot plate with something boiling on it, the dozens of pseudoephedrine packs, the jars, or the baking dish. He said he was aware that the residence had been raided several months earlier, but he had no reason to worry because he did not see any illegal activity on January 23, 2002.

On cross-examination, the defendant testified he was a close friend of Mr. Keahey prior to Mr. Keahey's 2001 arrest for manufacture of methamphetamine. He testified that Mr. Keahey's prior arrest did not cause him any concern or make him pay more attention to the presence of MMOs in the area. He knew there was a back room in the residence that Mr. Keahey "ke[pt]

-4-

some junk in," but he denied seeing any of the items found by the police search. He testified that he would sleep on the couch in the living room when he slept over, and he washed his own dishes in the sink after eating pizza that day. The defendant denied seeing smoke in the residence and the numerous mason jars found in the dishwasher.

After the jury found the defendant guilty, the trial court held a sentencing hearing and sentenced the defendant to four years on the manufacturing charge, three years on the attempted possession charge, and one year and six months on the paraphernalia charge. The trial court ordered that the sentences be served concurrently for an effective sentence of four years, to be served via 60 days of incarceration on consecutive weekends and three years and ten months on probation.

In the defendant's timely appeal, he challenges the sufficiency of the evidence, asserts that the convictions for manufacture of methamphetamine and felony possession of drug paraphernalia were inconsistent, and alleges that the trial court erred by excluding testimony from a court clerk regarding the filing of the January 23, 2002 search warrant.

## I. Sufficiency of the Evidence

The defendant first argues generally that a directed verdict should have been granted based on the insufficiency of the evidence. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92, 61 L. Ed. 2d 560 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). The rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

In determining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id*. at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

"It is an offense for a defendant to knowingly . . . manufacture a controlled substance." T.C.A. § 39-17-417(a)(1). "It is an offense for a defendant to knowingly . . . possess a controlled substance with intent to manufacture, deliver or sell such controlled substance." *Id.* § 39-17-417(a) (4).

> Except when delivered, possessed with the intent to deliver, or manufactured with the intent to deliver by a person authorized by this

part and title 53, chapter 11, parts 3 and 4 to dispense, prescribe, manufacture or possess a controlled substance, it is unlawful for any person to deliver, possess with intent to deliver, or manufacture with intent to deliver, drug paraphernalia, knowing, or under circumstances where one reasonably should know, that it will be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this part.

*Id.* § 39-17-425(b)(1).

At issue here is whether sufficient evidence established that the defendant possessed the controlled substances and paraphernalia and, if so, whether the defendant intended to deliver the paraphernalia when he either knew or should have known that it would be used for one of the statutorily prohibited uses.

Tennessee courts recognize that possession may be either actual or constructive. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). A person constructively possesses a controlled substance when he or she has "the power and intention at a given time to exercise dominion and control over [the contraband] either directly or through others." *Id.* at 903 (quoting *State v. Patterson*, 966 S.W.2d 435, 445 (Tenn. Crim. App. 1997)). Said differently, constructive possession is the "ability to reduce an object to actual possession." *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "the mere presence of a person in an area where drugs are discovered is not, alone, sufficient." *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000) (citing *Cooper*, 736 S.W.2d at 129). "Likewise, mere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs." *Cooper*, 736 S.W.2d at 129.

Applying the inferences from the evidence most favorable to the State, we conclude that the evidence was sufficient to establish that the defendant constructively possessed the drugs and paraphernalia. Mr. Keahey resided at the mobile home, and the defendant visited often and stayed overnight occasionally. On the date in question, the defendant was apparently in the kitchen and living room areas for some time before the arrival of the police. The occupants of the residence delayed in responding to the knock on the door by the police officers. Most of the paraphernalia was found in the kitchen, a common area of the residence and one that was very close to the defendant's location. Both detectives testified that there was smoke and a strong odor consistent with an MMO. The television was not turned on in the residence, and the defendant provided no other reasonable explanation for being inside the residence at time the police arrived. Viewed in the light most favorable to the state, the length of time the defendant spent in the residence, the proximity of the defendant to the evidence, the relationship between the defendant and Mr. Keahey, and the officers' testimony about odor and smoke support a finding of sufficiency of evidence in regards to constructive possession.

We are aware of *State v. Don Woody McGowan*, No. M2001-02866-CCA-R3-CD, slip op. at 2-13 (Tenn. Crim. App., Nashville, June 28, 2002), in which this court held the evidence of McGowan's possession of drugs insufficient. That case, however, is factually distinguishable. McGowan stated that he had been inside the searched residence for "less than fifteen minutes before police entered." *Id*. at 12. McGowan had "traveled to Whitewell to visit with friends" the evening of his arrest. *Id.* at 11. Finally, the drug paraphernalia in *McGowan* was found entirely in a duffel bag located in the bedroom of the residence, while McGowan never left a couch in the living room. *Id.* at 4-5, 11.

Here, the defendant had been inside the residence for at least an hour before the police arrived. Further, there was a close relationship between the defendant and the owner of the residence searched, to the point that the defendant was visiting the residence "[q]uite often." A chemical odor and smoke were prominent inside the residence. Finally, the bulk of the paraphernalia was recovered in the kitchen of the residence, an area adjacent to the living room where the defendant was found at the time the police arrived, and an area in which the defendant admitted to being earlier that day when washing dishes and placing his coat at the kitchen table.

Given the finding of constructive possession, the testimony at trial, and the TBI analysis of the substances found in the residence, we hold that the evidence is sufficient to support a conviction on the charges of manufacturing a controlled substance and attempted possession of a controlled substance with intent to sell.

The defendant further argues that there is insufficient evidence to support his conviction of felonious possession of drug paraphernalia because there is no proof of his intent to deliver it anywhere. We agree. The law in question proscribes as a Class E felony the possession of drug paraphernalia with intent to deliver the paraphernalia. *See* T.C.A. § 39-17-425(b)(1). Applying the inferences from the evidence most favorable to the State, we conclude that although the defendant constructively possessed the paraphernalia, nothing in the evidence or testimony suggests intent on behalf of the defendant to deliver the drug paraphernalia to any other person or location. Similarly, no evidence or testimony was presented to support anticipated arrival of transported paraphernalia. The essential elements of this offense were not established by the evidence, and this conviction must be modified to a conviction of the lesser included offense of misdemeanor possession of drug paraphernalia, *see id.* § 39-17-425(a)(1), a paraphernalia charge that does not include the element of transfer.

Because we have modified the conviction to Class A misdemeanor possesion of drug paraphernalia, *see id.*, we must likewise modify the sentence. For the Class A misdemeanor, we impose a sentence of eleven months and 29 days with a $2,500 fine. We do not disturb the alternative sentencing plan provided by the trial court.

*II. Inconsistent Verdicts*

-7-

The defendant next claims that his convictions for manufacture of a controlled substance and possession of drug paraphernalia are inconsistent, because "the essence of a manufacturing conviction is the use of [the paraphernalia]," and "the essence of the felony paraphernalia charge is the transfer of them to another person . . . ." With the modification of the paraphernalia conviction from a felony to a misdemeanor, however, the element of delivery has been eliminated, and this argument is moot.

## III. Exclusion of Evidence

The defendant sought to call assistant court clerk Linda Willis to testify that she could not find in court records a search warrant return for the January 23, 2002 search of Mr. Keahey's residence. The defendant claimed that Ms. Willis' testimony would support his theory that Detective Myers was confused about the details of the January and February searches. The trial court refused to let the jury hear Ms. Willis' testimony.

The decision to admit or exclude this evidence lies within the sound discretion of the trial court. *State v. Edison*, 9 S.W.3d 75, 77 (Tenn. 1999); *State v. Jackson*, 52 S.W.3d 661, 669 (Tenn. Crim. App. 2001); *State v. Carroll*, 36 S.W.3d 854, 867 (Tenn. Crim. App. 1999), *perm. app. denied* (Tenn. 2000). On appellate review of a trial court's decision to admit or exclude evidence on the basis of relevance, an appellate court may disturb the lower court's ruling only if there has been an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989).

We hold that the trial court was within its discretion to deny the introduction of this evidence because the testimony of Detective Myers had already established that he had filed a copy of the return with the clerk's office but that the clerk's office copy could not be found. *See* Tenn. R. Evidence 402, 403.

## IV. Conclusion

For the reasons above expressed, the judgments of the trial are affirmed except for the conviction of felony possession of drug paraphernalia, which is hereby modified to a conviction of misdemeanor possession of drug paraphernalia with a sentence of eleven months and 29 days and a $2,500 fine. The probation arrangement provided by the trial court remains in effect.

_____
JAMES CURWOOD WITT, JR., JUDGE