# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 6, 2007

## STATE OF TENNESSEE v. WILLIS AYERS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-07182     Chris Craft, Judge**

---

### No. W2006-02441-CCA-R3-CD  - Filed May 6, 2008

---

Defendant, Willis Ayers, was indicted for first degree murder and especially aggravated robbery. Defendant was tried jointly with co-defendant, Charles Curtis, and another co-defendant, David Milken, was tried separately for the charged offenses. Co-defendant Curtis's case is not part of this appeal. Following a jury trial, Defendant was found guilty of the lesser included offenses of second degree murder and facilitation of especially aggravated robbery. The trial court sentenced Defendant as a Range I, standard offender, to twenty-two years for his second degree murder conviction, and as a Range II, multiple offender, to fourteen years for his facilitation of especially aggravated robbery conviction. The trial court ordered Defendant to serve his sentences consecutively, for an effective sentence of thirty-six years. In his appeal, Defendant argues that (1) the evidence was insufficient to support his convictions; (2) the trial court erred by failing to instruct the jury that State's witness Corey Smith was an accomplice to the charged offenses; (3) the trial court erred in denying Defendant's motion for severance; and (4) the trial court erred in imposing consecutive sentencing. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which and JAMES CURWOOD WITT, JR., and J. C. MCLIN, JJ., joined.

Eric Christensen, Memphis, Tennessee, for the appellant, Willis Ayers.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General; William L. Gibbons, District Attorney General; Michelle Kimbril-Parks, Assistant District Attorney General; and Alanda Dwyer, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Christy Bernard testified that the victim was her brother, Charlie Jackson, Jr. Ms. Bernard said that the victim drove a burgundy Cadillac which was registered in the name of Angela Morton, the victim's cousin. Ms. Bernard stated that she worked evenings, and the victim would take her sons to football practice after school. The victim kept the children's football gear in the trunk of the Cadillac. Ms. Bernard said that she last saw the victim on April 22, 2004, between 7:00 and 7:30 p.m. at Ms. Morton's residence when she picked up her sons after football practice. Ms. Bernard observed the victim place her sons' football gear into the trunk of his car before she left. Ms. Bernard said that the victim's leather coat was also in the trunk, and both the football gear and the leather coat were missing from the Cadillac's trunk when the vehicle was returned to her after the commission of the offenses. Ms. Bernard identified the football helmet and shoulder pads which were introduced as an exhibit at trial as her sons' equipment. Ms. Bernard said that the leather coat was never recovered.

Corey Smith testified that he had known Defendant for approximately four years and Mr. Curtis, the co-defendant, approximately seven years. Mr. Smith stated that he went over to Monica Terry's apartment in Summit Park Apartments to play cards on April 22, 2004, between 7:00 p.m. and 8:00 p.m. David Milken, Ms. Terry's boyfriend, Ms. Terry, and Ms. Terry's friend, Glenda, were present. Mr. Curtis arrived approximately one hour later. Mr. Curtis told the group that he needed money because he had no place to stay. Mr. Curtis asked Mr. Milken for his cell phone and then retreated to the bathroom. Mr. Curtis came out of the bathroom a few minutes later, retrieved Ms. Terry's house telephone, and returned to the bathroom.

Defendant arrived at Ms. Terry's apartment while Mr. Curtis was talking on the telephone. Defendant had a book pack with him which he placed in Ms. Terry's bedroom. Defendant, Mr. Curtis and Mr. Milken went outside and stood at the bottom of the apartment's staircase, conversing, while Mr. Smith and Ms. Terry remained at the top of the stairs overlooking the apartment building's parking lot. Mr. Curtis continued to talk on Ms. Terry's house telephone as the three men conversed.

Approximately thirty to forty-five minutes later, Mr. Smith observed a burgundy Cadillac pull into the parking lot. Mr. Curtis got into the front passenger seat as Defendant and Mr. Milken walked toward the "dark part" of the apartments located next door. The driver of the Cadillac and Mr. Curtis remained in the Cadillac for approximately twenty minutes. Mr. Milken then walked up to the driver's side of the Cadillac and attempted to pull the driver out of the vehicle by his neck. The vehicle jerked, and the brake lights came on. Mr. Smith said that Defendant walked up to the driver's side of the vehicle, pulled out a gun, and fired once. The driver slumped over in the car seat. Mr. Milken pushed the driver into the passenger seat and got into the driver's seat. Mr. Curtis got into the back seat, and the two men drove away.

Mr. Smith and Defendant went back inside Ms. Terry's apartment. Defendant put his gun in his book pack and told Mr. Smith that the shooting was an accident. Defendant said that he thought he saw the victim reach down and believed that the victim was going to retrieve a weapon. Mr. Curtis and Mr. Milken returned to Ms. Terry's apartment approximately thirty to forty-five minutes later in the burgundy Cadillac. Mr. Curtis told Mr. Smith that he needed "to put in some work." Mr. Smith told Mr. Curtis that he did not want to be involved, but Mr. Curtis began to verbally threaten Mr. Smith.

Mr. Curtis opened the Cadillac's trunk and handed Mr. Smith two football helmets, some shoulder pads, and a leather coat. Mr. Smith took the items into Ms. Terry's apartment. Mr. Smith said that Mr. Curtis had taken some cocaine, marijuana, and twenty dollars from the victim. Mr. Curtis began cooking the cocaine on Ms. Terry's stove.

Mr. Smith, Mr. Curtis and Mr. Milken then drove the Cadillac to an insurance office building approximately one-half mile from Ms. Terry's apartment. Mr. Curtis handed Mr. Smith some lighter fluid and told him to set the car on fire. Mr. Smith poured lighter fluid on the back seat, then he handed the lighter fluid back to Mr. Curtis. Mr. Smith told Mr. Curtis that he did not want anything "to do with it," and Mr. Curtis set the Cadillac on fire. Mr. Smith, Mr. Curtis, and Mr. Milken walked back to Ms. Terry's apartment and played cards.

Mr. Smith testified that he did not know the victim. Mr. Smith said that he did not overhear either Mr. Curtis' telephone conversations or the conversation between Mr. Curtis, Defendant, and Mr. Milken while they stood at the bottom of the stairs.

On cross-examination, Mr. Smith said that the only person he saw with a gun that night was Defendant, and that the first time he noticed the weapon was when Defendant fired the gun at the victim. Mr. Smith said that Defendant's arm was fully extended, and that the victim was facing forward in the vehicle. Mr. Smith acknowledged that Defendant was not present when the Cadillac was set on fire. Mr. Smith denied making a statement to Kaylandra Ayers or Patricia Marchbanks. Mr. Smith acknowledged that he did not hear anyone, including Defendant, plan to commit any offenses involving the victim.

Officer Jeff Sealey with the Memphis Police Department routinely patrolled Will Carruthers Park during his evening shift. Officer Sealey testified that he observed an individual, who appeared to be unconscious, lying on his back with outstretched arms in the park's parking lot around midnight on April 22, 2004. Officer Sealey approached the man and attempted to find a pulse. When he could not do so, he called for an ambulance and back-up.

Officer Marlon Wright, a member of the Memphis Police Department's crime scene investigation unit, arrived at the park shortly after midnight. Officer Wright testified that the victim's pockets were turned inside out. Various pieces of a broken cell phone were recovered at the crime scene including the cell phone's face plate, back plate, rubber keypad and battery. A dime

was found next to the victim's left leg, and the victim had eleven cents in one of his pockets. Officer Wright found the victim's driver's license but not a wallet.

Officer Bryan Davis responded to a call about an abandoned vehicle at approximately 1:00 a.m. on April 23, 2004. The vehicle was parked near a building behind the Summit Park Apartments. Officer Davis stated that the vehicle was registered in the name of Angela Morton, and the vehicle's keys were missing.

Angela Morton, the victim's cousin, spent the afternoon of April 22, 2004, with the victim at her son's and Ms. Bernard's sons' football practice. After practice, the football gear belonging to Ms. Bernard's sons was stored in the trunk of the Cadillac which the victim drove. The victim left Ms. Morton's apartment that evening at approximately 8:00 p.m. to attend a birthday party. Ms. Morton said the victim was driving the burgundy Cadillac which was registered in her name. Ms. Morton last spoke with the victim by cell phone between 8:45 and 9:00 p.m. Ms. Morton said that the victim's cell phone was registered in her name.

Lakeshea Roche Cobb dated Mr. Curtis off and on for eleven years prior to the offenses. Ms. Cobb testified that Mr. Curtis called her in mid-April, 2004, and asked where she was. Ms. Cobb told him she was at Marlowe's, a local restaurant, with her co-employees. Mr. Curtis arrived some time after 11:00 p.m. Ms. Cobb said that she and Defendant sat down at a table to talk, and Ms. Cobb noticed some specks of blood on Mr. Curtis' white t-shirt. Mr. Curtis first told Ms. Cobb that he had been in a fight and had been struck in the nose. When Ms. Cobb replied that nothing appeared wrong with his nose, Mr. Curtis told her that he had shot someone. Ms. Cobb said that she just "cried and looked at him." Mr. Curtis then told Ms. Cobb that she knew he would not do anything like that.

A man entered the restaurant and told Mr. Curtis, "Man, we got to go." Ms. Cobb accompanied the two men to the door. Ms. Cobb observed Mr. Curtis and the man get into an older, large vehicle similar to a Cadillac and drive away. Ms. Cobb went back inside the restaurant.

Ms. Cobb said that Mr. Curtis called her approximately two weeks later and arranged a meeting. Ms. Cobb picked Mr. Curtis up, and they stopped at a gasoline station. Mr. Curtis told her that he was "feeling heavy about something." Mr. Curtis told Ms. Cobb that he had shot "Big Daddy." Ms. Cobb identified the victim as the man she knew only as "Big Daddy."

Ms. Cobb said that Sergeant Tim Sims contacted her on June 19, 2004, and escorted her to the police station. Ms. Cobb identified Mr. Milken from a photographic line-up as the man who had left Marlowe's with Mr. Curtis. Ms. Cobb spoke with Mr. Curtis the day after he was arrested, and Mr. Curtis told her to dispose of the football gear that was at Ms. Terry's apartment. Ms. Cobb said that she called Sergeant Sims and told him that she had retrieved the football gear. Ms. Cobb acknowledged that Mr. Curtis had told her he used to buy drugs from the victim.

On cross-examination, Ms. Cobb said that she did not see a weapon on either Mr. Curtis or Mr. Milken while they were at Marlowe's. Ms. Cobb denied that she had entered into a relationship with Sergeant Sims after she gave her statement, but she acknowledged that she was in Sergeant Sims' boat when he drowned during a boating accident. Ms. Cobb said that she did not know Defendant, and she acknowledged that Defendant was not present at Marlowe's with Mr. Curtis and Mr. Milken.

Officer Ernestine Davison testified that she was present when Ms. Cobb gave a statement to Sergeant Sims concerning the shooting. Officer Davison said that she typed up Ms. Cobb's statement, and Ms. Cobb read it over, made corrections, and signed the last page. On cross-examination, Officer Davison said that she was not present during Sergeant Sims' initial interview of Ms. Cobb. Officer Davison acknowledged that when Ms. Cobb was asked why Mr. Curtis shot the victim, she responded it was because the victim had shorted him on a drug sale.

Sergeant Elaine Shelby, an investigator with the District Attorney's Office, attempted to locate Monica Terry before trial. Ms. Terry's mother told Sergeant Shelby that Ms. Terry had died in November 2004, from a lung disease.

Tabatha Bender, an operations manager with Cricket Communications, testified that Ms. Morton's cell phone was used on April 22, 2004, to place two calls to the same specified telephone number at 10:25 p.m. and 11:37 p.m. respectively. Ms. Morton's cell phone received a call from that number at 12:29 a.m. on April 23, 2004.

Sergeant Anthony Mullins, a member of the Memphis Police Department's homicide unit, testified that the victim's fingerprints were found on the cell phone located in the park where the victim was found. Sergeant Mullins accompanied Sergeant Sims to Ms. Cobb's apartment on June 19, 2004. Ms. Cobb told the officers about her meeting with Mr. Curtis at Marlowe's. Ms. Cobb also stated that Mr. Curtis told her that he had just shot someone and taken his car. Mr. Curtis then started laughing and told Ms. Cobb he "was just playing." Ms. Cobb said that Mr. Curtis left in "a brown or burgundy car, possibly a Cadillac." On cross-examination, Sergeant Mullins said that the police investigation of the crimes had been concluded before Sergeant Sims died.

Dr. Tom Deering was serving as Shelby County's Interim Chief Medical Examiner at the time of the incident and performed an autopsy on the victim on April 23, 2004. Dr. Deering testified that the victim died as a result of a single gunshot wound to his forehead. The wound was located above the mid-point of the victim's right eyebrow. The presence of stippling and soot around the wound indicated that the barrel of the gun was between six and twenty-four inches from the victim when the weapon was discharged. Dr. Deering said that the presence of stippling in the victim's eyes and the even spacing of the stippling around the wound indicated that the victim was directly facing the shooter and his eyes were open when he was shot.

Dr. Deering stated that the bullet traveled to the back of the victim's head, causing subdural and subarachnoid hemorrhaging. Dr. Deering said that the victim would have immediately lost

consciousness after he was shot, but that the victim could have lived for a few seconds to a few minutes after the injury. The bullet was extracted from the victim's head during the autopsy. Dr. Deering stated that the victim also had bruising and swelling around his eyes and two abrasions on the back of his left wrist. On cross-examination, Dr. Deering testified that he did not know if the victim's eyes were blackened before the shooting or as a result of the shooting. Dr. Deering said that he did not detect any injuries to the victim's neck.

Mr. Curtis testified in his own behalf. Mr. Curtis said that he arrived at Ms. Terry's apartment on April 22, 2004, between 6:00 p.m. and 7:00 p.m. Mr. Smith, Mr. Milken, and Ms. Terry's friend, Glenda, were also present. At some point, Mr. Curtis called Ms. Cobb, and a male voice responded on her answering machine. Mr. Curtis grew angry. He continued to call Ms. Cobb until he reached her, and they argued over the telephone. When the battery on the cell phone he was using went dead, Mr. Curtis continued to talk to Ms. Cobb on Ms. Terry's house telephone.

Mr. Curtis stated that he did not have a way to get to Marlowe's where Ms. Cobb worked, so he called the victim, whom he had known since elementary school, and asked for a ride. Mr. Curtis told the victim that he wanted to go to Marlowe's to get something to eat, but the victim believed that Mr. Curtis wanted to see if Ms. Cobb was with another man. The victim told Mr. Curtis he would go buy him something to eat from another restaurant. The victim left and returned to the Summit Park Apartments between 9:45 and 10:00 p.m. The victim and Mr. Curtis sat in the victim's vehicle and talked for approximately ten to twenty minutes.

Mr. Curtis said that Mr. Milken walked passed the Cadillac, and the victim appeared nervous. Mr. Curtis reassured the victim that Mr. Milken was a friend. Mr. Milken walked passed the vehicle a second time, grabbed the victim's head, and tried to pull him out of the Cadillac. Defendant appeared at the front passenger side of the vehicle and pointed a gun through the open window. Mr. Curtis said that he hit Defendant's arm, and the gun discharged, striking the victim in the forehead. Mr. Curtis described the events immediately following the shooting:

> After the shooting, Mr. Jackson fell forward onto my shirt. And, I jumped out of the car. [Defendant] ran. When [Defendant] ran, [Mr.] Milken panicked and talk[ed] about burning the car. So, I said, no, I said, let's go to the baseball park. I went to the baseball park because I played softball up there, and I know what time the police run. They run every hour up there like clockwork. So, instead of burning the body in the car[,] I dropped the body and took the car. We left, when we left the park, [we] went to Marlowe's.

Mr. Curtis stated that he told Ms. Cobb he had shot someone "basically, to scare her." Mr. Curtis went to Marlow's because he wanted "to show [his] face." Mr. Curtis explained that "if you see a murder, no witness, no case," and Mr. Curtis wanted Ms. Cobb to see that he was with Mr. Milken if anything happened to him. Mr. Curtis said that after they left Marlowe's, Mr. Milken drove the Cadillac back to the Summit Park Apartments. Mr. Milken handed Mr. Smith the football gear and the leather coat from the Cadillac's trunk, and Mr. Smith took the items into Ms. Terry's

apartment. Mr. Milken retrieved some lighter fluid from the apartment, and Mr. Curtis told Mr. Milken that he would burn the vehicle. Mr. Curtis said that he and Mr. Smith drove to an insurance building a short distance from the apartments. Mr. Smith poured lighter fluid on the vehicle and set it on fire. Mr. Curtis said that he did not return to Ms. Terry's apartment but walked instead to a nearby hotel where he had a room.

Mr. Curtis gave a statement to Sergeant Sims about the incident. As he was leaving, Sergeant Sims told Mr. Curtis that he would need a second statement the next day about the shoulder pads that were in the victim's Cadillac. Mr. Curtis said that "shook [him] up," so he called Ms. Cobb asked her to dispose of the football gear. Mr. Curtis denied that he knew what Mr. Milken and Defendant planned to do that night. Mr. Curtis acknowledged that he helped dispose of the body and burn the victim's Cadillac.

On cross-examination, Mr. Curtis said that the victim was facing him when Defendant shot him through the front passenger side window. Mr. Curtis said that Mr. Milken pulled the victim out of the vehicle by himself after they arrived at the park, and Mr. Curtis remained in the Cadillac. Mr. Curtis acknowledged that he did not try to help the victim after he was shot and that his only thought was "to clean up the mess." Mr. Curtis denied that Mr. Smith was afraid of him and said that he did not talk to Mr. Smith after the shooting.

Mr. Curtis said that he had heard about Defendant but did not personally know him. Mr. Curtis acknowledged that he bought cocaine from the victim which he later resold. Mr. Curtis said that a police car appeared behind them while Mr. Milken was driving to the park. The victim was in the front passenger seat, bent over with his face pointed toward the floorboard. Mr. Curtis told Mr. Milken not to panic. Mr. Curtis said that he did not know whether the victim was still alive when they arrived at the park. Mr. Curtis denied taking any money or drugs from the victim. Mr. Curtis said that Mr. Milken smashed the victim's cell phone and jumped back in the Cadillac. Mr. Curtis acknowledged that he told Ms. Cobb he "had a heavy conscious [sic]," but said that they had that conversation in a hotel room, not a gasoline station.

On redirect examination, Mr. Curtis said that the victim did not carry drugs late at night because he was afraid he would be robbed.

Defendant then presented his defense to the jury. Kaylandra Ayers, Defendant's sister, testified that Mr. Smith contacted her after the shooting and asked Ms. Ayers to take him to Defendant's attorney. Ms. Ayers said that Mr. Smith wanted to tell the attorney that Defendant was with him on the porch when the victim was shot, and that Defendant did not shoot the victim.

On cross-examination, Ms. Ayers said that she did not know Mr. Smith, but Mr. Smith knew some of her siblings. Ms. Ayers said that she never told her brother about Mr. Smith's statement that Defendant was not the shooter. Ms. Ayers acknowledged that Mr. Smith testified at the preliminary hearing that Defendant shot the victim. Ms. Ayers acknowledged that she did not tell the police about Mr. Smith's statement, and she did not see Mr. Smith again after the preliminary hearing.

Patricia Marchbanks testified that she was working as a paralegal for Defendant's attorney at the time of the incident. Ms. Marchbanks said that Ms. Ayers brought Mr. Smith to the office the day before Defendant's preliminary hearing, but Defendant's attorney was not there. Ms. Marchbanks took notes as Mr. Smith talked. Mr. Smith told Ms. Marchbanks that the investigating officers had changed his statement, and he felt bad and wanted to clear things up. Ms. Marchbanks said that she intended to type up Mr. Smith's statement, but Mr. Smith said he would not sign the statement, and left the office before the statement could be prepared.

On cross-examination, Ms. Marchbanks said that she did not have an opportunity to tell Defendant's attorney about the meeting before the preliminary hearing.

## II. Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support his convictions of second degree murder and facilitation of especially aggravated kidnapping. Defendant argues that Mr. Smith was an accomplice as a matter of law whose testimony that Defendant was the shooter was uncorroborated by anyone other than his co-defendant, Mr. Curtis. Defendant also contends that the trial court erred in not instructing the jury that Mr. Smith was an accomplice as a matter of law.

The trial court found that Mr. Smith was not an accomplice as a matter of law and that his status as an accomplice was a question for the jury to decide. The trial court specifically found:

> [O]f course, Mr. Smith's testimony was that he had nothing to do with the murder or the robbery at all. That after it was completed he then took the, he put lighter fluid in the car and at the request of the defendants he took the football equipment. So, that's a question for the jury to decide. They're going to have to evaluate all of that. I did not hear Mr. Curtis testify that Mr. Smith was in on anything. Nor, [in] any of the proof you put on. So, for that reason because it's a question for the jury, I'm going to use that paragraph and make it optional.

The trial court instructed the jury:

> [i]f you find from the proof that the witness was an accomplice, then a defendant cannot be convicted upon the uncorroborated testimony of this witness. If you find that the witness was not an accomplice, then you will judge the weight to be given to his testimony just as you do that of the other witnesses in the case.

"An accomplice is one who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of a crime." *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004) (citing *State v. Lewis*, 36 S.W.3d 88, 94 (Tenn. 2000); *Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975)). "This means that the person must do more than have guilty knowledge, be morally delinquent, or participate in other offenses with the principal actor." *State v. Jackson*, 52 S.W.3d 661, 665 (Tenn. Crim. App. 2001) (citing *Pennington v. State*, 478 S.W.2d 892, 898

(Tenn. Crim. App. 1971)). "Essentially, an accomplice must be a person who could be indicted for the offense at issue." *Jackson*, 52 S.W.3d at 665. If the offense in question was not committed by the person's own conduct, the person may, nonetheless, be criminally responsible as a principal to the offense if the person "solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2).

It is well established in Tennessee that a defendant cannot be convicted upon the uncorroborated testimony of an accomplice. *Bough*, 152 S.W.3d at 464. A trial court must declare a witness to be an accomplice as a matter of law and so advise the jury when it is clear and undisputed that the witness participated in the crime. *Jackson*, 52 S.W.3d at 665. However, "[w]hen the evidence is unclear, conflicts or is subject to different inferences, then the jury is to determine whether the witness is an accomplice." *Id*.

The only evidence connecting Defendant to the commission of the offenses was presented through the testimony of Mr. Smith and Mr. Curtis, the co-defendant, who was clearly an accomplice as a matter of law. By its verdict, the jury obviously found that the evidence supported a finding that Mr. Smith was not an accomplice to the crimes.

Mr. Smith, who was not indicted following the crimes, denied any involvement in the offenses although he acknowledged that he was present before, during, and after the shooting and robbery. Mr. Smith testified that he remained on the porch in front of Ms. Terry's apartment while Defendant, Mr. Milken and Mr. Curtis accosted the victim. Mr. Smith's presence during the victim's murder, by itself, is not enough to support a finding that he was an accomplice to the crimes. *See Jackson*, 52 S.W.3d at 666 (finding that the witness's presence in the hallway while the victim was beaten in an adjoining room did not implicate "him in either the kidnapping or murder in such a way as to be an accomplice").

Mr. Smith acknowledged that he poured lighter fluid onto the Cadillac's back seat after the victim was shot and his body left in the park. However, it has long been held that an accessory after the fact is not an accomplice to the charged offenses whose testimony must be corroborated. *State v. Thomas*, 158 S.W.3d 361, 402 (Tenn. 2005) (concluding that the witness's "actions in allowing the defendant into her home after the commission of the crimes, going shopping with the stolen money and receiving part of the proceeds for herself, do not make her a principal to the offense of murder or robbery of the victim"); *see also Pennington v. State*, 478 S.W.2d 892, 897 (Tenn. Crim. App. 1971); *State v. Tyree Robinson*, No. W2004-02555-CCA-R3-CD, 2006 WL 3371411, *12 (Tenn. Crim. App., at Jackson, Nov. 17, 2006), *no perm. to appeal filed*; *State v. Christopher Duwan Robertson*, No. M2001-00976-CCA-R3-CD, 2002 WL 31188228, *13 (Tenn. Crim. App., at Nashville, Oct. 2, 2002)), *perm. to appeal denied* (Tenn. Jan. 27, 2003)..

Based on our review of the record, we conclude that the trial court did not err in finding that Mr. Smith was not an accomplice as a matter of law and by accordingly instructing the jury. Moreover, the evidence justified the jury in determining that Mr. Smith was not an accomplice whose testimony must be corroborated.

Turning now to Defendant's challenge to the sufficiency of the evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

The offense of second degree murder is an unlawful and "knowing killing of another." T.C.A. § 39-13-210(a)(1); *see id*. § 39-13-201(a)(1). A person acts "knowingly" with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id*. § 39-11-302(b). Mr. Smith testified that Mr. Milken grabbed the victim by the neck while the victim sat in his vehicle, and that Defendant walked up to the vehicle after the victim was restrained, pulled out a gun, and shot the victim. Mr. Smith stated that Defendant returned to Ms. Terry's apartment and put the gun in his book pack. When Mr. Smith asked why Defendant shot the victim, Defendant said that it was an accident because he though the victim was reaching for a weapon.

Mr. Curtis' testimony mirrored Mr. Smith's version of the events leading up to the victim's death except that Mr. Curtis testified that Defendant shot the victim through the front passenger side window instead of the driver's side window as indicated by Mr. Smith. We also observe that Ms. Cobb testified that Mr. Curtis told her that he had shot the victim but then indicated that he was merely joking. Deciding whether there are inconsistencies in testimony, reconciling conflicts in testimony, and how this might affect a witness's credibility, are all within the province of the jury. Based on our review, we conclude that a rational trier of fact could find beyond a reasonable doubt that Defendant was guilty of second degree murder. Defendant is not entitled to relief on this issue.

"A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, ... the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a). An especially aggravated robbery is a robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. *Id*. § 39-13-403(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id*. § 39-13-401(a).

Defendant argues that the evidence was insufficient to support a finding that a robbery occurred. Viewing the evidence in a light most favorable to the State, Mr. Curtis arrived at Ms. Terry's apartment, announcing that he needed money because he did not have a place to stay. After the victim was shot, Mr. Curtis and Mr. Milken disposed of the victim's body in a local park and then returned to Ms. Terry's apartment. Officer Wright testified that the victim's pockets were turned inside out when he was found. Mr. Smith testified that he removed the victim's personal items from the trunk of the Cadillac before it was set on fire. Ms. Cobb testified that she later retrieved the football equipment from Ms. Terry's apartment at Mr. Curtis's request. Mr. Smith testified that Mr. Curtis took twenty dollars and some cocaine from the victim. Although there was no evidence that Defendant was present when the victim's personal items were taken, the evidence supports a finding that Defendant's action of shooting the victim in the forehead facilitated the commission of the robbery offense.

Based on the foregoing, we conclude that a rational trier of fact could find beyond a reasonable doubt that Defendant was guilty of the facilitation of especially aggravated robbery.

## IV. Motion to Sever

Although jointly indicted, the State initially set separate trial dates for Defendant, Mr. Curtis, and Mr. Milken. Mr. Milken was tried separately first and convicted of first degree felony murder and especially aggravated kidnapping. *See State v. David Milken*, No. W2006-01850-CCA-R3-CD, 2007 WL 2768078 (Tenn. Crim. App., at Jackson, Sept. 21, 2007), *no perm. to appeal filed*. In February 2006, the State filed a motion to consolidate Defendant's and Mr. Curtis's trials which was opposed by Defendant. At a pre-trial hearing on March 10, 2006, the State explained that the reason the three co-defendants were initially severed was because it intended to introduce Mr. Milken's statement to the police at trial. This was no longer an issue after Mr. Milken was tried and convicted.

Defendant filed a motion opposing consolidation on March 17, 2006, on the basis that his theory of defense and that of Mr. Curtis were mutually antagonistic. An order disposing of Defendant's motion for severance is not in the record. However, at a pre-trial hearing on June 28, 2006, the trial court orally denied Defendant's motion. Relying on *State v. Ensley*, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996), the trial court found that "[u]nder the circumstances I'm seeing here, merely pointing the finger at each other would not fall into the criteria where I would need to sever this case" and granted the State's motion to consolidate. Both defendants orally renewed their respective motions to sever periodically during trial, which motions were denied by the trial court.

"The practice of trying co-defendants in a single trial is 'aimed at achieving improved judicial economy and efficiency.'" *State v. Mickens*, 123 S.W.3d 355, 383 (Tenn. Crim. App. 2003) (quoting Tenn. R. Crim. P. 8, Committee Cmts). A trial court must grant a severance before trial, however, if "appropriate to promote a fair determination of the guilt or innocence of one or more defendants," and during trial if "necessary to achieve a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(A) and (B). The grant or denial of a motion for severance

is a matter that rests within the sound discretion of the trial court. *Mickens*, 123 S.W.3d at 383 (citing *State v. Maddox*, 957 S.W.2d 547, 556 (Tenn. Crim. App. 1997)). "This Court has held, '[w]here a motion for severance has been denied, the test to be applied in determining whether the trial court abused its discretion is whether the defendant was "clearly prejudiced" in his defense as a result of being tried with his co-defendant.'" *Mickens*, 123 S.W.3d at 383 (quoting *State v. Price*, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000)).

It is not unusual in a joint trial for one defendant to attempt to lay blame on the other. *See State v. Ensley*, 956 S.W.2d 502 (Tenn. Crim. App.1996); *State v. Robinson*, 622 S.W.2d 62 (Tenn. Crim. App. 1981). However, antagonistic defenses are not prejudicial per se. *State v. Gosnell*, 62 S.W.3d 740 (Tenn. Crim. App. 2001); *Ensley* 956 S.W.2d at 509; *see also Zafiro v. United States*, 506 U.S. 534, 538-539, 113 S. Ct. 933, 938, ,122 L. Ed. 2d 317 (1993). Indeed, severance is not necessarily warranted even if prejudice is shown. *Zafiro*, 506 U.S. at 538-539, 113 S. Ct. at 938. The defendant must establish that he was so prejudiced that granting a severance ceased to be within the trial court's discretion. *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988).

Defendant submits that the prejudicial effects of the joint trial began when Mr. Curtis' counsel repeatedly asked Mr. Smith on cross-examination to confirm that it was Defendant and not Mr. Curtis who was armed that night. Although Defendant's argument emphasizes the conflict between his theory of defense and that of Mr. Curtis, Defendant was not hindered in presenting testimony that implicated Mr. Curtis as the shooter. Based on our review of the record, this incident does not evidence an effect so prejudicial as to warrant a separate trial.

Defendant argues that the trial court's limitations on his cross-examination of the State's witnesses as well as his defense witnesses resulted in his inability to thoroughly present his theory of defense. Defendant contends that the trial court's rulings in this regard were prompted solely by considerations arising out of a joint trial.

For example, Mr. Curtis' counsel objected when Defendant's counsel attempted to lay a foundation for the presentation of rebuttal evidence based on Mr. Smith's prior inconsistent statement to Ms. Ayers and Ms. Marchbanks. Although Mr. Curtis's counsel and the State initially objected, the trial court allowed Defendant's defense counsel to pursue this line of questioning. In both instances, Mr. Smith denied knowing either woman, and Mr. Smith's prior inconsistent statement was subsequently explored during the presentation of Defendant's defense. Based on our review of the record, we do not discern any prejudice that would warrant the grant of a severance.

Defendant argues that he was prejudiced by the joint trial when counsel for Mr. Curtis sought to challenge Ms. Cobb's credibility on cross-examination. Ms. Cobb's testimony that Mr. Curtis told her that he had shot the victim was clearly beneficial to Defendant's theory of defense. Defendant submits that Ms. Cobb's credibility would not have been an issue had he been tried separately.

Ms. Cobb's vulnerability to a credibility challenge resulted from an alleged relationship with Sergeant Sims after she gave her statement to the police and before trial. On cross-examination by

Mr. Curtis's counsel, Ms. Cobb acknowledged that she accompanied Sergeant Sims on a boating trip prior to trial, and that Sergeant Sims drowned during the outing. Ms. Cobb, however, repeatedly denied that she was involved in a romantic relationship with Sergeant Sims. Mr. Curtis' counsel followed up on this line of questioning during Sergeant Mullins' cross-examination. Sergeant Mullins acknowledged that as a general proposition, he believed that it was inappropriate for an investigating officer to become involved with a witness in a murder case during the investigation of the crime. Sergeant Mullins testified, however, that the police department's investigation of the offenses had been concluded and turned over to the district attorney's office prior to Sergeant Sims' death. After a lengthy hearing out of the presence of the jury, the trial court determined that none of the circumstances surrounding Sergeant Sims's death or the police department's investigation into Sergeant Sims's death could be explored during cross-examination.

Defendant's theory of defense was that Mr. Curtis was the shooter. Defendant candidly acknowledges that Ms. Cobb's testimony was beneficial to him in presenting this defense to the jury. Ms. Cobb's testimony on cross-examination about her contacts with Sergeant Sims prior to trial were brief, and she repeatedly denied any relationship. The trial court carefully limited the scope of cross-examination concerning the events before and after Sergeant Sims's death. Based on our review of the record as a whole, we conclude that Defendant has failed to show that he was so prejudiced by Ms. Cobb's cross-examination on this issue that a severance was warranted.

Defendant argues that he was prejudiced when Mr. Curtis made an inflammatory remark in front of the jury as the jury was leaving the courtroom. At the conclusion of Sergeant Shelby's testimony, a recess was called and the jury began leaving the courtroom. As they were leaving, Mr. Curtis apparently said a curse word which was overheard by the trial court. The trial court admonished Mr. Curtis for his conduct. After court reconvened, but before the jury was brought out, Mr. Curtis apologized for his outburst, and Defendant's counsel expressed concern over the incident. The following colloquy occurred:

DEFENSE COUNSEL: Your Honor, toward that end I did hear what [Mr. Curtis] said and it was a very unkind remark directed to the jury. And, my concern is that they may have heard that. I don't know if they heard it. I heard it. I don't know —

THE TRIAL COURT: Well, all I heard was the word [s . . .t]. And, I was watching him at the time. And so, the jurors never turned around. So, the reason I waited until the jury left and then I talked to him is because I don't think anybody was aware of it. If they were it was his own doing and it would not impact your client at all, [defense counsel].

-13-

DEFENSE COUNSEL: My concern is if they did hear it I don't know if they would know the source. And, I don't know if that would potentially prejudice [Defendant] Ayers if the jury heard what he said, because I heard what he said and it was directed . . .

THE TRIAL COURT: Right[,] and you were standing next to him. . . . I heard it because I was looking right at him at the time. Otherwise, I would not have said what I said. I just wanted to stop that. So, I make a finding of fact the jury did not hear anything he said that they could understand regarding it being directed at them. For all they know if anybody heard anything, he was talking about his opinion of the State's proof, which would not make any difference.

Based on our review of the record, we conclude that Defendant has failed to show that the trial court abused its discretion in determining that Mr. Curtis's isolated remark did not clearly prejudice Defendant. *See State v. Mickens*, 123 S.W.3d 355, 384 (Tenn. Crim. App. 2003) (concluding that a co-defendant's single flash of a gang sign in front of the jury was not so prejudicial as to warrant a mid-trial severance). Defendant is not entitled to relief on this issue.

Defendant contends that the prejudicial effect of a joint trial was further manifested because of the limitations placed on his direct examination of defense witnesses Kaylyndra Ayers and Patricia Marchbanks. On direct examination, Mr. Smith denied that he knew Ms. Ayers or Ms. Machbanks and testified that he had not made any statements to them about the shooting. At the close of the State's case-in-chief, the trial court conducted a hearing out of the presence of the jury concerning the proposed testimony of Defendant's witnesses, Ms. Ayers and Ms. Marchbanks

Ms. Ayers testified that Mr. Smith told them that Defendant was upstairs with him when the shooting occurred and that "Day-Day" shot the victim. At the conclusion of Ms. Ayers' testimony the following colloquy occurred:

TRIAL COURT: I think we need to treat this as we would a Bruton problem in a statement. I think what needs to happen is that [Ms. Ayers] needs to be allowed to testify to this alleged prior inconsistent statement. But she's not going to be allowed to say that Day-Day or [Defendant] Milken were the ones that did the killing. She would be allowed to say that he said that [Defendant] Ayers was not the person who shot. That he was with him at that time. . . . In other words, this is being offered not to prove that [Defendant] Curtis

-14-

did the killing. It's being offered to prove that Corey Smith's statement, his testimony is not credible. So, the fact that [Defendant Ayers] would be upstairs with Mr. Smith and the shooting was in the car would not in any way stop you from being able to argue that Mr. Smith's statement, that your client did this, is not credible.

DEFENSE COUNSEL: Would she be allowed to say who he told her was downstairs by the car or in the car?

TRIAL COURT: I think we need to just leave that out. Because if [Defendant Ayers] is upstairs then that's all that needs to happen. If she was talking about the other two people that were in the car, all that would do is . . . inculpate someone else and it would not tend to further exculpate your client.

Defendant argues that as a result of the trial court's ruling, Ms. Ayers and Ms. Marchbanks only testified to "the pared down version" of Mr. Smith's statements to them thereby hindering Defendant's efforts to present a complete defense. Defendant contends that had he not been tried jointly with Mr. Curtis, the witnesses would have been permitted to testify that Mr. Smith told them that Mr. Curtis was the shooter.

Tennessee Rule of Evidence 613(b) provides that:

[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice require otherwise. This provision does not apply to admissions of a party opponent as defined in Tennessee Rule of Evidence 803(1.2).

*See also State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982). Tennessee Rule of Evidence 613(b) allows the introduction of otherwise inadmissible extrinsic evidence for impeachment purposes. *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998). A prior inconsistent statement introduced for purposes of impeachment, however, may be considered only on the issue of credibility and not as substantive evidence. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000) (quoting *Jones v. Lenoir City Car Works*, 216 Tenn. 351, 392 S.W.2d 671, 673 (Tenn.1965)); *Reece*, 637 S.W.2d at 861; *State v. Jones*, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1991).

Both Ms. Ayers and Ms. Marchbanks testified at trial that Mr. Smith told them that Defendant was with him on Ms. Terry's porch when the shooting occurred in contradiction to his trial testimony that Defendant was downstairs at the victim's vehicle when the victim was shot.

-15-

Testimony that Mr. Smith went further and named Mr. Curtis as the shooter would have provided another example of inconsistency but such statement could not be considered by the jury as substantive evidence that Mr. Curtis was, in fact, the shooter. Even assuming that a more thorough direct examination of these rebuttal witnesses might have been possible in a separate trial, Defendant has not shown that the limitation on the scope of his direct examination, even if error, was so prejudicial as to warrant a separate trial. Defendant is not entitled to relief on this issue.

## V. Sentencing Issues

Defendant challenges the trial court's imposition of consecutive sentences based on a finding that Defendant was a dangerous offender. Specifically, Defendant submits that the trial court failed to make the requisite findings set forth in *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995) and thus may not rely upon Defendant's status as a dangerous offender in determining whether Defendant should serve his sentences consecutively.

At the sentencing hearing, the State relied on Defendant's presentence report which was introduced as an exhibit without objection. Defendant did not offer any evidence at the sentencing hearing.

According to the presentence report, Defendant stated that he was expelled from Hillcrest High School in the eleventh grade. Defendant worked periodically at various jobs in the past but has not been employed since 2000. Defendant stated that he joined the "Crips" when he was approximately nine years old but said that he ended his affiliation with the gang at some point in 2000. Defendant denied drinking alcohol or using any type of illegal drugs.

Defendant was twenty-four years old at the time the offenses were committed. According to the presentence report, Defendant was convicted in 1999 of aggravated burglary, a Class C felony, and sentenced to three years. In 2000, Defendant was convicted of evading arrest, a Class A misdemeanor; felony evading arrest, a Class E felony; and theft of property valued over $1,000, a Class D felony. Defendant was sentenced to eleven months, twenty-nine days for his misdemeanor evading arrest conviction, one year for his felony evading arrest conviction, and two years for his theft conviction. In 2003, Defendant was convicted of two counts of criminal trespass and one count of theft of property under $500.00, all misdemeanor sentences.

Based on the presence of the Class C and Class D felony convictions, the trial court sentenced Defendant as a Range II, multiple offender, for his facilitation of especially aggravated robbery conviction and as a Range I, standard offender, for his second degree murder conviction. *See* T.C.A. §§ 40-35-105; 40-35-106(a)(1). The trial court found that enhancement factor (1) based on Defendant's history of prior convictions in addition to those necessary to establish the appropriate range, was applicable to both convictions. *Id.* § 40-35-114(1). The trial court also found enhancement factor (9) applicable to Defendant's murder conviction in that Defendant possessed or employed a firearm during the commission of the offense. *Id.* § 40-35-114(9). Accordingly, the trial

court sentenced Defendant to twenty-two years for his murder conviction and fourteen years for his facilitation conviction.

The trial court found that the circumstances surrounding the offense were aggravated. The trial court found that confinement for an extended period of time was necessary to protect society from Defendant's unwillingness to lead a productive life and his "resorting to criminal activity in furtherance of an anti-societal lifestyle." The trial court found that an effective sentence of thirty-six years reasonably related to the offenses which consisted of "basically murdering a man and dumping him in a park after robbing him of his football equipment for the football team, kids that he's working with." Based on these considerations, the trial court found that Defendant was a dangerous offender for whom consecutive sentencing was appropriate.

We note that the legislature has recently amended several provisions of the Sentencing Reform Act of 1989, which became effective June 7, 2005. However, although Defendant was sentenced after the effective date of the amended Act, Defendant's crime in this case occurred prior to June 7, 2005, and Defendant did not elect to be sentenced under the provisions of the amended Act by executing a waiver of his ex post facto protections. *See* 2005 Tenn. Pub. Acts ch. 353 § 18. Therefore, this case is not affected by the 2005 amendments, and the statutes cited in this opinion are those that were in effect at the time the instant crimes were committed.

When a defendant challenges the length or the manner of service of his or her sentence, this Court must conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). This presumption, however, is contingent upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). If the record fails to show such consideration, the review of the sentence is purely *de novo. State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determinations the trial court must consider: (1) the evidence presented at the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any appropriate enhancement and mitigating factors; (6) the defendant's potential or lack of potential for rehabilitation or treatment; and (7) any statements made by Defendant in his own behalf. T.C.A. §§ 40-35-103 and -210; *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995). The defendant bears the burden of showing that his sentence is improper. T.C.A. § 40-35-401(d), Sentencing Commission Comments; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

When a Defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to run consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. In this instance, the trial court found that Defendant was "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(a)(4). If the trial court rests its determination of consecutive

sentencing on this category, the court must make two additional findings. *Imfeld*, 70 S.W.3d at 708. First, the trial court must find that an extended sentence is necessary to protect the public from further criminal conduct by Defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offenses. *Wilkerson*, 905 S.W.2d at 939. Although such specific factual findings are unnecessary for the other categories enumerated in Tennessee Code Annotated section 40-35-115(b), the imposition of consecutive sentences is also guided by the general sentencing principles that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" *Imfeld*, 70 S.W.3d at 708 (quoting T.C.A. §§ 40-35-102(1) and -103(2)); *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). Once appropriate factors have been found, it is within the sound discretion of the trial court whether or not to impose consecutive or concurrent sentences. *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

The trial court specifically addressed the *Wilkerson* factors at the sentencing hearing. That is, the trial court found that Defendant's continual engagement in criminal activity since reaching adulthood evidenced a need to protect society from further criminal conduct by Defendant, and that the effective sentence was reasonably related to the severity of the offenses. Based on our review of the record, we conclude that the length of Defendant's sentence is "'justly deserved in relation to the seriousness of the offense'" and "'no greater than that deserved for the offenses committed.'" Defendant is not entitled to relief on this issue.

Although not raised on appeal, we observe that the trial court's application of enhancement factor (9) to enhance Defendant's sentence for his second degree murder conviction is problematic in light of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). In *Blakely*, the United States Supreme Court concluded that the "'statutory maximum' for *Apprendi [v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L. Ed. 2d 435 (2000),] purposes is the maximum sentence a court may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. *Blakely*, 542 U.S. at 303. Our supreme court has recently concluded that other than a defendant's prior criminal convictions (or other enhancement factors admitted to by the defendant), the application of enhancement factors by the trial court rather than a jury, which increases the defendant's sentence beyond the statutorily presumptive minimum sentence, deprives the defendant of his or her Sixth Amendment right to have a jury determine whether those enhancement factors apply. *State v. Gomez*, 239 S.W.2d 740 (Tenn. 2007) (citing *Cunningham v. California*, 549 U.S. ___, 127 S. Ct. 856, 860, 166 L. Ed. 2d 856 (2007)). Thus, consideration of Defendant's prior criminal history, to which the trial court gave great weight "does not offend the Sixth Amendment." *Id*.

As noted above, Defendant did not execute a waiver as a means of electing sentencing under the *Blakely*-compliant 2005 amendments to the sentencing law. In setting the length of Defendant's sentence for his facilitation of especially aggravated robbery conviction, however, the trial court considered only Defendant's prior criminal history, and thus no Sixth Amendment concerns are implicated. *Id*. As for his sentence for second degree murder, Defendant is limited to plain error

-18-

review of this sentencing issue because he did not raise a *Blakely* issue as to the length of his sentence for this conviction either at trial or on appeal. *Id*. at 737.

Before an error is recognized as plain error, it must be "plain" and must affect a substantial right of the accused. The term "plain" equates to "clear" or "obvious." *See United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777 (1993). Plain error is not error that is simply conspicuous; rather, it is especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. *See State v. Wooden*, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983). In *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this court defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense and ... constitutional in nature." *Id*. at 639.

Based on our review, even though the trial court erred in considering enhancement factor (9) in determining the length of Defendant's sentence for his second degree murder conviction, consideration of Defendant's prior criminal convictions was entitled to sufficient weight to justify the enhancement of Defendant's sentence for his second degree murder conviction from the presumptive sentence of twenty years to twenty-two years. *See Gomez*, 239 S.W.3d at 743 (observing that the extent of the weight placed on the defendants' history of prior criminal convictions may well justify the imposition of the maximum sentence for all convictions). Thus, consideration of the Sixth Amendment concerns raised by the trial court's misapplication of enhancement factor (9) is not necessary to do substantial justice and Defendant is not entitled to plain error review.

**CONCLUSION**

After a thorough review of the record, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-19-